[No. C026773. Third Dist. Sept. 25, 1998.]

LELAND S. PURYEAR, Plaintiff and Appellant, v.
GOLDEN BEAR INSURANCE COMPANY et al., Defendants and
Respondents.

## COUNSEL

Albert L. Boasberg for Plaintiff and Appellant.

Schuering, Zimmerman & Scully, Leo H. Schuering, Jr., Douglas L. Smith and Christian Koster for Defendants and Respondents.

## OPINION

**BLEASE, Acting P. J.**—Leland S. Puryear (Puryear) appeals from a summary judgment granted defendants in his malicious prosecution action.

The trial court reasoned that defendants Golden Bear Insurance Company (Golden Bear) and Jones & Dyer, Golden Bear's counsel in the underlying lawsuit, had probable cause to sue Puryear personally because of confusion over the correct individual or entity legally responsible for the acts of an insurance brokerage firm.

 Puryear contends the trial court erred in finding probable cause. We agree. The test is whether a reasonable attorney would have thought the claim objectively tenable. The record at most suggests there was liability on the part of an insurance brokerage doing business as a corporation in which Puryear had been a corporate officer and had owned stock. There is no evidence from which the defendants could have inferred that Puryear was personally liable for the acts of the brokerage. In these circumstances no reasonable attorney would have thought the claim against Puryear was tenable.

We will reverse the summary judgment.

### FACTS AND PROCEDURAL BACKGROUND

In August 1987, Puryear and Allen Spangenberg incorporated A & L Insurance Services, Inc., a California corporation, to conduct business as an excess and surplus lines insurance broker. They owned all the stock and were the officers and directors of the corporation. They observed all of the requisite formalities for conducting the corporation, and all of its business

transactions were conducted under the corporate name. The corporation did business with Golden Bear only under its corporate name.

Early in 1993, Puryear and Spangenberg decided to sell their interests in the corporation. They sold all of their shares, half in February 1993 and the other half in September 1993, to Terry Suzuki, represented by Attorney Mark Wood. The corporate records and share certificates were delivered to Wood in September 1993. In November 1993, Wood, as general counsel for the corporation, filed with the Secretary of State the annual corporation statement under Corporations Code section 1502, listing the new officers and directors and Suzuki as chief executive officer.

In March 1993, George Makris sued Golden Bear and 20 Doe defendants, alleging that Golden Bear wrongfully failed to pay fire insurance proceeds. The complaint in pertinent part alleged the following. Before the fire that gave rise to this action, Makris requested through "A & L Insurance," an authorized agent of Golden Bear, that his fire insurance coverage under a Golden Bear policy be increased. Golden Bear and "A & L Insurance" told him that upon receipt of a letter, verifying that specified safety improvements were made, coverage would be increased. He made the improvements and sent the letter. The fire occurred. He submitted a claim. "A & L Insurance" then told him that his coverage had not been increased and Golden Bear refused to pay benefits required under the increased coverage.

Sometime before December 23, 1993, Golden Bear filed a cross-complaint in the Makris action. On that date it filed an amended cross-complaint naming "A & L Insurance Services" and Roe defendants 6-10 as cross-defendants from whom equitable indemnity was sought. The amended cross-complaint describes "A & L Insurance Services" as "a business organization, the exact legal description of which is presently unknown." It alleges that the cross-defendants were negligent in transmitting Makris's letter verifying the safety improvements to Golden Bear.

In January 1994, Golden Bear filed an amended complaint. It added A & L Insurance Services, Inc., as a named defendant and used that appellation in the allegations previously made concerning "A & L Insurance Services."

In some manner not explained in the record, counsel for Makris conversed with Suzuki's counsel, Wood, in January 1994. Wood said that he represented A & L Insurance Services, Inc., that L. Scott Puryear[1] and Melody Packet were employees of the corporation and he agreed to produce them for a deposition. However, they did not appear at the scheduled time.

---

[1]This is the style of the Puryear appellation used by Puryear's son, who was employed by A & L Insurance Services, Inc., prior to the transfer of its stock to Suzuki.

In some manner not explained in the record, Golden Bear took "A & L Insurance Services" default. On March 17, 1994, Wood faxed a letter to Sandra Sava, counsel for Golden Bear. The letter asserts that Wood had been mistaken, and that L. Scott Puryear and Melody Packet were "not employed at the present time by A & L." On March 25, 1994, Sava had a telephone conversation with Wood, who requested that the default be set aside. Sava said she would probably not agree to that in light of Wood's failure to produce L. Scott Puryear and Melody Packet for depositions. Wood told her that "A & L Insurance Services had been sold by Mr. Spangenburg [*sic*] and Mr. Puryear to new owners in the Fall of 1993." Sava declared that Wood said Spangenberg and Puryear were no longer involved with "the new A & L Insurance Services" and suggested that Golden Bear "had sued the wrong A & L entity." Sava's handwritten notes from the conversation include the following: "Sold their shares to Suzuki."

Sava further declared that: "Prior to April 4, 1994, at my request, a law clerk in our office conducted some research from the Department of Insurance regarding A & L entities and Puryear." An undated memorandum from the law clerk to Sava, in pertinent part on the subject of "Dept. of Insurance Investigation of A & L Services, Inc.," reads as follows.

"A & L Insurance Services, Inc. 4525 Wilshire Blvd Los Angeles CA 90010

"A & L is licensed as a Fire & Casualty Broker-Agent, surplus broker and special surplus broker. . . . [¶] In addition to Puryear and Spangenberg, A & L endorsees include: Mia C. Chang, Patrick J. Omeirs and Joseph Trocino. [¶] Spangenberg & Puryear are no longer active/licensed in surplus & special, only active in Fire & Casualty w/A&L. [¶] When I searched under Spangenberg & Puryear individually, I discovered through the department's 'organization endorsements' files that each is presently active w/A&L Fire & Casualty and with another company . . . ."

On April 8, 1994, Golden Bear amended its cross-complaint again, naming as Roe 6: "Lee Puryear, aka L. Scott Puryear, individually, and dba A & L Insurance Services."

On April 11, 1994, Sava wrote a letter to Wood asking when the sale of "A & L Insurance Services" occurred, whether all assets and liabilities were transferred, whether any prior owners still have an interest in "the existing company," and what is the present legal status of "A & L."

On May 4, 1994, Sava sent a letter to Golden Bear in which she asserted, among other things, that Wood "denied that the new A & L assumed any of the former A & L's liabilities . . . ."

On December 17, 1994, Golden Bear caused a summons on the cross-complaint to be served on Puryear. Trial was scheduled in the Makris case for March 6, 1995. On March 2, 1995, Golden Bear settled with Makris, paying him $175,000. Golden Bear then sought to recoup this sum or some portion of it from Puryear. When Puryear refused to settle, Golden Bear ultimately dismissed its cross-complaint against him.

Puryear then filed the complaint initiating this malicious prosecution action against Golden Bear and Jones & Dyer. The defendants moved for summary judgment on the ground that Golden Bear's indemnity action against Puryear was filed (and presumably maintained) with probable cause.

In addition to the foregoing background, Puryear contended that summary judgment was inappropriate in light of defendants' responses to various discovery requests, to wit: Golden Bear admitted that it had never done business with Puryear as an individual and knew that he was an officer of A & L Insurance Services, Inc. In response to an interrogatory asking on what theory and factual investigation the allegation of Puryear's negligence was based, Golden Bear responded that it did not know.

As to Jones & Dyer, Gregory Dyer and Sava conceded in deposition testimony that they had no evidence to support a theory of alter ego liability against Puryear and failed to identify any evidence to support Puryear's personal liability for the shortcomings of A & L Insurance Services, Inc.

Golden Bear and Jones & Dyer responded that the opposition to the summary judgment was misdirected. Their claim was succinctly stated as follows. "Through interaction with Mark Wood, and investigation at the Department of Insurance, facts developed suggesting the A & L Insurance Services, Inc. entity which had appeared in the action was not the proper entity. Therefore, it raised the reasonable probability the old A & L entity and potentially its individual officers and shareholders could be responsible for the acts of that entity."

The trial court granted summary judgment because the facts adduced by the defendants "establish there was a legally tenable claim against A & L Insurance Services and sufficient confusion in the minds of defendants over the correct individual or entity which was legally responsible for the acts of the former A & L Insurance Services, to constitute probable cause for filing the cross-complaint against plaintiff as an individual at the time the cross-complaint was filed."

The trial court summarized its reasoning as follows.

"One of my favorite quotes was the old Dick Butkus quote and it's rather famous. When they asked him what his philosophy was as a defensive back, he said, I go through the line. I tackle the entire back field and then I throw them away one at a time until I find the guy with the ball. And in some cases in litigation, that also is necessary. The fact that the entire back field got tackled doesn't mean that he had no probable cause to tackle any given one of them under some circumstances.

"Here, where you're getting conflicting information, you got to sort through it somehow. And the attorney who waits until he or she has absolutely clear in their mind exactly who the right entity to sue is may sometimes miss the statute and then face the possibility of being sued for professional negligence by his or her own client."

Puryear appeals from the ensuing judgment.

## DISCUSSION

Puryear contends the trial court erred in concluding defendants had probable cause to sue him personally because there was no objective, reasonable basis in the facts known to Golden Bear and Jones & Dyer for a belief that the claim against him in his personal capacity was tenable. We agree.

■ "Under the governing authorities, in order to establish a cause of action for malicious prosecution of either a criminal or civil proceeding, a plaintiff must demonstrate 'that the prior action (1) was commenced by or at the direction of the defendant and was pursued to a legal termination in his, plaintiff's, favor [citations]; (2) was brought without probable cause [citations]; and (3) was initiated with malice [citations].' (*Bertero* v. *National General Corp.* (1974) 13 Cal.3d 43, 50 [118 Cal.Rptr. 184, 529 P.2d 608, 65 A.L.R.3d 878]; Rest.2d Torts, §§ 653-681B.)" (*Sheldon Appel Co.* v. *Albert & Oliker* (1989) 47 Cal.3d 863, 871-872 [254 Cal.Rptr. 336, 765 P.2d 498].)[2]

■ The standard of probable cause is "whether any reasonable attorney would have thought the claim tenable . . . ." (*Sheldon Appel Co.* v. *Albert & Oliker, supra,* 47 Cal.3d at p. 886.) "[T]he probable cause element calls on the trial court to make an objective determination of the 'reasonableness' of the defendant's conduct, i.e., to determine whether, on the basis of the facts known to the defendant, the institution of the prior action was legally tenable. The resolution of that question of law calls for the application of an objective standard to the facts on which the defendant acted." (*Id.* at p. 878,

---

[2]We have no occasion in this case to consider the question of malice.

italics omitted.) "[I]t does *not* include a determination whether the attorney subjectively believed that the prior claim was legally tenable." (*Id.* at p. 881, italics added.) In this respect, *Sheldon Appel* overruled the earlier leading case, *Tool Research & Engineering Corp.* v. *Henigson* (1975) 46 Cal.App.3d 675 [120 Cal.Rptr. 291]. However, the term "legally tenable," employed in *Sheldon Appel* to describe probable cause, is derived from *Tool Research* at page 683.

The question in this case is the meaning of the term "legally tenable" when the issue is whether the person who filed the allegedly malicious action had sufficient facts to warrant that action. Specifically, the question is whether an action is "legally tenable" when a prospective plaintiff and counsel do not have evidence sufficient to uphold a favorable judgment or information affording an inference that such evidence can be obtained for trial.

*Tool Research* and the earlier California case law on which it relies suggest (albeit without discussion) that an action is not legally tenable unless it is founded on facts sufficient to support a reasonable belief that the evidence will sustain a favorable judgment.

" 'Probable cause' has sometimes been defined as 'reasonable cause'; and in the case of both civil and criminal prosecutions has been further defined to be an honest suspicion or belief on the part of the instigator thereof, founded upon facts sufficiently strong to warrant the average person in believing the charge to be true." (*Murdock* v. *Gerth* (1944) 65 Cal.App.2d 170, 178-179 [150 P.2d 489].)[3]

Under this standard probable cause requires evidence sufficient to prevail in the action or at least information reasonably warranting an inference there is such evidence. (See generally, Rest.2d Torts, § 662, and com. g, pp. 425-426.) A lack of probable cause may arise from an insufficiency in the facts or the law. (See Rest.2d Torts, §§ 662, 675.) The Restatement Second of Torts section 662, comment g, page 426, describes the principal kind of insufficiency in the facts applicable to this case: "A third type of mistake occurs when the accuser, having no personal knowledge of the actual conduct of the accused, knows or is credibly informed of circumstances that lead him mistakenly to believe that the accused has acted or failed to act in a particular manner. Whether this knowledge or information is enough to

---

[3]Also see e.g., *Jensen* v. *Leonard* (1947) 82 Cal.App.2d 340, 351 [186 P.2d 206]; *Kassan* v. *Bledsoe* (1967) 252 Cal.App.2d 810, 816 [60 Cal.Rptr. 799]; cf. *Tool Research & Engineering Corp.* v. *Henigson, supra,* 46 Cal.App.3d at page 683, defining probable cause as "the existence of evidence which, if believed by the trier of fact in the earlier lawsuit, would have resulted in a judgment for [the malicious prosecution defendant]."

give the accuser probable cause for initiating . . . proceedings depends upon whether the inferences of fact that he draws from the data before him are such as a reasonable man would draw."

■ As related, the trial court was of the view that a less stringent standard of "legally tenable" should be applied. Under that standard, a prospective plaintiff would require something less than substantial evidence or the likelihood of substantial evidence to support the cause of action in order to justify filing the action. Because the earlier California case law does not squarely address this prospect and because there is a less stringent standard in some other jurisdictions, we will examine it.

The majority rule related in Restatement Second of Torts section 675,[4] is significantly less stringent in an action for malicious prosecution when the underlying action is a civil proceeding. "One who takes an active part in the initiation, continuation or procurement of civil proceedings against another has probable cause for doing so if he reasonably believes in the existence of the facts upon which the claim is based, and . . . [¶] (a) correctly or reasonably believes that under those facts the claim *may* be valid under the applicable law . . . ." (*Ibid.*, italics added.) Comment d explains the basis for this latitude.

"*d. Points of difference between criminal and civil proceedings.* In one particular a private prosecutor's reasonable belief in the guilt of the accused differs from the reasonable belief of one who initiates private civil proceedings against another. A private prosecutor does not have reasonable grounds for believing that the accused has conducted himself in a particular manner, if he merely entertains a suspicion even though he reasonably believes it may be verified upon further investigation. (See Comment *c* on § 662). On the other hand, when the proceedings are civil, while the person initiating them cannot have a reasonable belief in the existence of the facts on which the proceedings are based if he knows that the alleged facts are not true and his claim is based on false testimony, it is enough if their existence is not certain but he believes that he can establish their existence to the satisfaction of court and jury. In a word, the initiator of private civil proceedings need not have the same degree of certainty as to the relevant facts that is required of a private prosecutor of criminal proceedings. In many cases civil proceedings, to be effective, must be begun before all of the relevant facts can be

---

[4]Not all jurisdictions follow the majority rule. For example, in *Hibernia Nat. Bank of New Orleans* v. *Bolleter* (La. 1980) 390 So.2d 842, the bank sued Wanda Bolleter on a note in spite of her denial that she had signed the note and in spite of the fact it was apparent that the signature on the note did not match her signature. The Louisiana Supreme Court found there was no probable cause because the bank did not have sufficient facts to warrant the belief it was more probable than not she had signed the note.

ascertained to a reasonable degree of certainty. To put the initiator of civil proceedings to a greater risk of liability would put an undesirable burden upon those whose rights cannot be otherwise effectively enforced." (Rest.2d Torts, § 675, com. d, p. 459.)

We are not persuaded by this comment to depart from the California cases which have applied the more stringent test of probable cause to malicious civil prosecution.[5] The Restatement rule is predicated on a dilemma to prosecute or perish that is obviated by an unusual feature of California procedural law. That feature is the unique broad scope of our fictitious defendant practice under Code of Civil Procedure section 474. (See Hogan, *California's Unique Doe Defendant Practice: A Fiction Stranger Than Truth* (1977) 30 Stan.L.Rev. 51.)

Under Code of Civil procedure section 474, a plaintiff who lacks sufficient evidence to prove a cause of action, or information warranting an inference that such evidence will be obtained, can "otherwise effectively enforce its rights" by use of a Doe allegation, or, as in this case, a Roe allegation. (See, e.g., 4 Witkin, Cal. Procedure (4th ed. 1997) Pleading, § 445, pp. 540-541.) This avoids the need for "the harmful practice in all litigation of requiring that all persons who might conceivably have some connection with the lawsuit be specifically named . . . ." (*Munoz* v. *Purdy* (1979) 91 Cal.App.3d 942, 947-948 [154 Cal.Rptr. 472].) A prospective California plaintiff need not tackle the entire back field to ascertain the likely defendants. Since the reason for the Restatement rule does not apply to this case, neither does the rule. (See Civ. Code, § 3510.)

Under the California probable cause rule an action against Puryear is tenable only if the facts known to Golden Bear and Jones & Dyer afforded an inference that he personally was negligent in communicating between Golden Bear and Makris, or that A & L Insurance Services, Inc., was not a corporation at that time, or that the corporate veil could be pierced as to him.

Viewed in the light most favorable to the respondents, there is nothing in the record which affords such an inference. There is no information suggesting that Puryear was personally involved in the Makris matter, or that he satisfied any criterion for piercing the corporate veil. As to corporate status, there is nothing which affords an inference that A & L Insurance Services, Inc., was not a corporation at the pertinent time.

Golden Bear admitted it was aware Puryear was a corporate officer. The client-serving assertion of Wood to Sava that A & L Insurance Services,

---

[5]Thus, we have no occasion to determine whether Golden Bear and Jones & Dyer would pass the somewhat murky test prescribed in the Restatement.

Inc., had not assumed liabilities in the sale does not suffice. The statement is a legal conclusion, from a dubious source, and, in any event, any aspersion on the corporate status of what Sava mischaracterizes as the former A & L entity is utterly belied by Wood's factual statement that the transfer was accomplished by a sale of stock. The information suggesting that Puryear was still listed by the Department of Insurance as an "endorsee" of A & L Insurance Services, Inc., has no tendency to suggest that the entity is anything but a corporation.

For all the foregoing reasons, the trial court erred in finding that Golden Bear and Jones & Dyer had probable cause. Their self-proclaimed "confusion" is immaterial to probable cause vel non. The proverbial reasonable attorney would not think a claim manifestly unsupported by essential evidence or information reasonably affording an inference that such evidence could be procured is tenable.[6]

### DISPOSITION

The summary judgment is reversed. Puryear shall recover his costs of this appeal.

Davis, J., and Scotland, J., concurred.

A petition for a rehearing was denied October 20, 1998, and respondents' petition for review by the Supreme Court was denied December 22, 1998.

---

[6]Golden Bear argues in its respondents' brief on appeal that the summary judgment in its favor should be upheld in any event on the theory that it relied in good faith on the advice of counsel. We imply no view on this defense. This theory was not broached in the summary judgment proceedings, there is no direct evidence of the state of mind of the Golden Bear decision makers in the record, and we decline to consider it for the first time on appeal.