[No. F038533. Fifth Dist. June 23, 2003.]

JERRY PALMER et al., Plaintiffs and Respondents, v.
ESMAT ZAKLAMA et al., Defendants and Appellants.

**[Opinion certified for partial publication.\*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts II.D. and II.E.

1368

## COUNSEL

Ericksen, Arbuthnot, Kilduff, Day & Lindstrom and Michael D. Ott for Defendants and Appellants.

Kenneth W. Kind for Plaintiffs and Respondents.

## OPINION

**BUCKLEY, J.**—Jerry Palmer and Mark Yarber (Palmer and Yarber) bought a house in January of 1993 at a sheriff's sale in Bakersfield. The house was sold to satisfy a $9,000 judgment against the previous owners, Esmat and Selvia Zaklama (the Zaklamas),[1] who by then were living in New Jersey. Pending an appeal from the judgment, the Zaklamas recorded a "Notice of Pending Action," or lis pendens, against the property. (See Code Civ. Proc., § 405.2.)[2] Shortly afterward, they filed suit against Palmer and Yarber in federal district court in Fresno seeking to set aside the sale, and a petition for chapter 11 bankruptcy back in New Jersey. They recorded lis pendens in connection with these two actions as well. And the Zaklamas sued Palmer and Yarber twice more, but they did not record lis pendens in those cases since in neither one of them were they attempting, directly, to regain title to or possession of the house.

Palmer and Yarber had planned to repair and resell the house, but were not able to given the cloud on their title created by the three lis pendens. They likewise were unable to refinance the loan at a lower interest rate while the lis pendens remained in effect. And they incurred maintenance and repair costs, taxes, insurance, and other expenses in the four years before they finally were able to sell it.

---

[1] It seems Selvia Zaklama had little, if any, role in the events underlying this appeal, except perhaps to sign papers presented to her by her husband. The Zaklamas separated sometime prior to trial, and Selvia did not testify. We will refer to them collectively as the Zaklamas, and individually by their first names for the sake of clarity only; we mean no disrespect.

We note that Selvia's name was misspelled throughout the record as Sylvia.

[2] Unless noted otherwise, all further statutory citations will refer to the Code of Civil Procedure.

The three lis pendens eventually were expunged, terminated, or withdrawn—the last in September of 1995. Palmer and Yarber refinanced the loan later that year and finally sold the house in 1997 on less favorable terms, they would claim, than they could have received in 1993. They then brought this action against the Zaklamas for malicious prosecution, slander of title, and abuse of process. A jury found in their favor on all three causes of action, and awarded them compensatory and punitive damages. The Zaklamas have appealed.

We will affirm the judgment.

## I. FACTUAL AND PROCEDURAL HISTORY

In 1984, the Zaklamas, who are both physicians, bought a house on Panorama Drive in Bakersfield for $147,500 (the Panorama house). They gave the seller, a Mr. Gannon, a down payment and a note for the balance of the purchase price, $105,000, payable at 11 percent interest. The note was secured by a deed of trust on the house.

The Zaklamas lived in the Panorama house until December of 1989, when they moved to Los Angeles briefly, and then to New Jersey. Before they left Bakersfield, the Zaklamas hired Thomas Sykora, who worked for a company called Responsive Property Management (RPM), to rent and take care of the house for them in their absence.

Sykora paid to have various repairs made to the house over the next few years, and billed the Zaklamas for these expenses. The Zaklamas refused to pay them. So, in 1992, when their outstanding balance was some $9,000, RPM sued the Zaklamas and obtained a judgment for this amount. (This is usually identified as the municipal court case or the collection action.) RPM then levied a writ of execution against the Panorama house, and a sheriff's sale was set for January of 1993.

Yarber saw a legal notice of the sale in the local newspaper, and mentioned it to his friend Palmer. The two men had talked about doing some real estate deals together and, after some investigation, decided the Panorama house would be a good place to start. They went to the sale and bought the house for $10,000. Yarber estimated its value at the time was between $210,000 and $240,000.

Palmer and Yarber cleaned up the house (which was still occupied by a renter) and listed it for sale shortly after they bought it. A prospective buyer offered them $200,000, and they made a counteroffer of $210,000. About

then, however, Esmat learned of the sheriff's sale (he would later claim he had not received notice) and he contacted a lawyer. In February of 1993, the lawyer recorded a lis pendens on the Zaklamas' behalf, giving notice an appeal was pending in the collection action. As a consequence, Palmer and Yarber were unable to proceed with the house sale.

The lis pendens also prevented Palmer and Yarber from borrowing money, at the then available rate of 8 percent, to pay off the 11 percent loan from Gannon. When the lis pendens finally was withdrawn, and Palmer and Yarber were able to get a loan in December of 1995, the interest rate had gone up to 9.6 or 9.7 percent. Moreover, the amount due Gannon had increased from about $70,000 at the time of the sheriff's sale, to approximately $115,000. The difference represented the expenses Gannon had incurred over the years attempting to collect delinquent house payments from the Zaklamas (including the costs of initiating foreclosure proceedings).

In April of 1993, the Zaklamas filed a petition for chapter 11 bankruptcy in New Jersey (the bankruptcy action). They also filed what they termed a "civil rights" suit in federal court in Fresno (the federal or civil rights action) against Palmer and Yarber, and seemingly everyone else having had anything to do with the sale of the Panorama house. The bankruptcy action raised the possibility, Esmat testified, that the sheriff's sale would be set aside as a preferential transfer.[3] The civil rights action, he explained, sought to set aside the sale on the theory that Palmer and Yarber "were in cahoots" with Sykora, RPM, and the sheriff to acquire title to the Panorama house.[4] Thus, the Zaklamas recorded notices of pending action in regard to these two

[3] Under the Bankruptcy Code, a "preference" is a prohibited form of favoritism by a debtor in bankruptcy toward some creditors but not others of the same class. With certain exceptions, the preference provisions of the code make voidable, *at the option of the bankruptcy trustee* (not the debtor), any property transfer made by the debtor, while insolvent, in payment of a debt owed before the transfer, provided the transfer occurred no more than 90 days before the debtor filed for bankruptcy. (11 U.S.C. § 547(b); *Matter of Xonics Imaging Inc.* (7th Cir. 1988) 837 F.2d 763, 764.)

"If there were no rule against preferences, an insolvent debtor, teetering on the edge of bankruptcy and besieged by creditors, might have an incentive to buy off the most importunate of his creditors, necessarily at the expense (the debtor being insolvent) of other creditors, in the hope of keeping afloat a little longer. Knowing that the debtor might do such a thing, an unsecured creditor who sensed that a debtor might be about to go belly-up would have a strong incentive to petition him into bankruptcy so that the debtor could not deplete the assets available to pay this creditor by paying another unsecured creditor instead. [Citations.] Thus the voidable-preference provision actually helps debtors as a group (as well as creditors as a group) by making creditors more forbearing." (*Matter of Xonics Imaging Inc., supra,* 837 F.2d at p. 765.)

[4] Subject to certain exceptions, a sale of property to satisfy a judgment is absolute and may not be set aside for any reason. (See § 701.680, subd. (a).) A judgment debtor (e.g., the

cases as well, on the premise they would, if successful, affect the title to, or the right to possession of, the Panorama house. (See § 405.4.)

In June of 1993, after the Zaklamas had filed the bankruptcy and federal actions, they met with Palmer and Yarber at a meeting arranged by Gannon (the former owner who still held a note on the house) in an effort to reach a settlement. According to Esmat, he offered Palmer and Yarber $20,000 if they would give him back the house, but they refused. According to Yarber, however, Esmat offered them nothing but freedom from further lawsuits, and said they should chalk up the $10,000 they would lose to a "learning experience."

Indeed, the collection, bankruptcy, and civil rights actions were not the end of the litigation by the Zaklamas against Palmer and Yarber. The tenant in the Panorama house, Pearl Minor, was refusing to pay rent to Palmer and Yarber. They got an eviction order and writ of possession, which they then attempted to serve. But when they arrived at the house, the Zaklamas had locked themselves inside with their children, Esmat's brother Shukry Messiah (who had replaced Minor as the tenant), and their mother. They refused to come out, or to unlock the door, despite repeated requests. Palmer and Yarber called the police. The Zaklama family was no more cooperative with the law, who eventually climbed into the house through an unlocked window and arrested them. The Zaklamas later sued the police, and many others (including Palmer and Yarber), for false arrest (the false arrest action).

That same day, Palmer and Yarber called Hansen's Moving & Storage company and arranged to have the Zaklamas' furniture moved into storage. The Zaklamas sued the Hansens too, along with Palmer and Yarber again, on a theory not revealed in the record (the furniture storage action). Both this suit and the one for false arrest, like the civil rights suit, were filed in federal court.

The lis pendens relating to the bankruptcy action was terminated after the action was dismissed in March of 1995. The lis pendens relating to the civil rights action was expunged in July of that year. And Esmat withdrew the lis pendens relating to the appeal of the collection action in September.

---

Zaklamas), however, may bring an action within 90 days of the sale to set it aside if the purchaser at the sale was the *judgment creditor* (e.g., Sykora and RPM). (*Id.*, subd. (c)(1).) Thus, it seems the Zaklamas' theory was that Palmer and Yarber had conspired to gain title to the Panorama house for the benefit of Sykora and RPM in order to avoid this provision. The action was filed in federal court based, presumably, on the court's diversity jurisdiction.

The record on appeal contains none of the pleadings from the bankruptcy and civil rights actions, and no information about them other than Esmat's testimony.

In December of 1995, as we have mentioned, Palmer and Yarber refinanced the house and paid off the balance of the Gannon loan, plus Gannon's expenses and accrued interest, a total of $115,000. The house was valued then, for purposes of the loan, at $177,000. They finally sold it in March or April of 1997 for $155,000. Yarber would attribute the loss in value—from $210,000 in 1993 to $155,000 in 1997—to a downturn in the local housing market. In this same period, according to Yarber, they spent nearly $45,000 for repairs to the house. All told, Yarber estimated he and Palmer made $243 on the sale of the Panorama house.

Palmer and Yarber sued the Zaklamas—on the theories of malicious prosecution, abuse of process, and slander of title—to recover the losses they claimed to have suffered during the three- or four-year period the lis pendens prevented them selling or refinancing the Panorama house.[5] They asserted the lis pendens, and the underlying legal actions, were meritless proceedings undertaken solely to coerce them into giving back the house, and on this basis they sought punitive damages as well. The Zaklamas, of course, denied these assertions and claimed in their defense that they had relied in all such matters on the advice of their attorneys. They also asserted their recordation of the lis pendens was privileged.

The jury, by special verdict, found Esmat liable under all three causes of action, and awarded Palmer and Yarber $235,463 in compensatory damages. In addition, it found Esmat had acted with malice, and awarded $125,000 in punitive damages as to him.

The jury found Selvia liable for abuse of process and slander of title (but not malicious prosecution), and likewise awarded $235,463 in compensatory damages.[6] It found she too had acted with malice, and awarded $200,000 in punitive damages as to her.

Judgment was entered accordingly on April 13, 2001. The Zaklamas' subsequent motion for new trial or modification of the verdict was denied. They then appealed.

## II. DISCUSSION

The Zaklamas raise five issues on appeal. They claim: (1) the trial court should not have admitted certain evidence from which it might be inferred

[5]As we discuss below, the first amended complaint did not assert a cause of action for abuse of process. It somehow became part of the case before the trial, however, even though the complaint was never amended to include it. The court instructed the jury on the cause of action, and it was reflected in the verdict form.

[6]The judgment awarded compensatory damages against Esmat and Selvia, jointly and severally, in the amount of $235,463.

they were a litigious and disputatious couple; (2) the complaint failed to state facts sufficient to constitute a cause of action for abuse of process; (3) the complaint failed to state facts sufficient to constitute a cause of action for slander of title; (4) the evidence fails to support the jury's verdict on the cause of action for malicious prosecution; and (5) the jury's award of compensatory damages should be reduced, or retried, because it included an amount the jury intended to impose as punitive damages. We will address these issues in a somewhat different order.

The essential premise of Palmer and Yarber's complaint was that the three actions underlying the lis pendens were brought for an improper purpose and/or were not the type of proceedings for which it was appropriate to record a notice of lis pendens. The initial question then, assuming this premise is correct, is: What cause or causes of action lie for wrongful recordation of a lis pendens?

"The purpose of a lis pendens is to give constructive notice of an action affecting real property to persons who subsequently acquire an interest in that property, so that the judgment in the action will be binding on such persons even if they acquire their interest before the judgment is actually rendered." (*Bishop Creek Lodge v. Scira* (1996) 46 Cal.App.4th 1721, 1733 [54 Cal.Rptr.2d 745].)

At common law, a purchaser or encumbrancer of real property acquired an interest subject to the outcome of any pending litigation affecting title to the property, even if the purchaser or encumbrancer had no notice of the litigation. (*Richardson v. White* (1861) 18 Cal. 102, 106.)

"This harsh rule was designed to prevent the defendant property owner from frustrating any judgment that might eventually be entered by transferring his or her interest in the property while the action was still pending. [Citation.] This rule also had the effect, however, of creating hardship for purchasers or encumbrancers who failed to discover a pending action despite a reasonable search. [Citation.]" (Cal. Lis Pendens Practice (Cont.Ed.Bar 2d ed. 2001) § 1.2, p. 3.)

California first adopted a statutory lis pendens procedure in 1851, which provided that a party to an action affecting real property could record a notice of lis pendens in the county where the property was located such that a subsequent purchaser or encumbrancer would be charged with constructive notice of the action from the time the recording was made. (*Sampson v. Ohleyer* (1863) 22 Cal. 200, 210.) The statutory procedure, and the amendments that followed, were intended to restrict rather than enlarge the common law doctrine of notice, and to curb abuses of the procedure. (*Urez Corp.*

*v. Superior Court* (1987) 190 Cal.App.3d 1141, 1144-1145 [235 Cal.Rptr. 837].)

"This is because of the ease with which a lis pendens can be recorded and the serious consequences flowing from it. Once a lis pendens is filed, it clouds the title and effectively prevents the property's transfer until the litigation is resolved or the lis pendens is expunged." (*BGJ Associates v. Superior Court* (1999) 75 Cal.App.4th 952, 966-967 [89 Cal.Rptr.2d 693].)

The Legislature amended the lis pendens statutes in 1968 to add former sections 409.1 to 409.6, which established a procedure by which a property owner could expunge a lis pendens under certain circumstances. (Stats. 1968, ch. 815, §§ 1-6, pp. 1572-1573.) Later amendments added sections 409.7 to 409.9.

"The Legislature enacted [the expungement procedures] in an attempt to alleviate problems which had arisen from the misuse of notices of lis pendens. [Citation.] Prior to 1968, . . . section 409 permitted any plaintiff who had filed a lawsuit claiming an interest in real property to record a notice of lis pendens without prior court approval or supervision. Because the recording of a lis pendens placed a cloud upon the title of real property until the pending action was ultimately resolved, a time period frequently encompassing several years, the lis pendens procedure was susceptible to serious abuse, providing unscrupulous plaintiffs with a powerful lever to force the settlement of groundless or malicious suits. [Citations.]

"Before the enactment of the expungement legislation in 1968 there was no meaningful prejudgment procedure either to identify those instances in which the lis pendens remedy was being abused or to alleviate the potential harm caused by such abuse. The Legislature adopted section 409.1 et seq. to afford such a remedy." (*Malcolm v. Superior Court* (1981) 29 Cal.3d 518, 524-525 [174 Cal.Rptr. 694, 629 P.2d 495] (*Malcolm*); see also *Nash v. Superior Court* (1978) 86 Cal.App.3d 690, 700 [150 Cal.Rptr. 394] ["The oppressive quality of a notice of any lis pendens is obvious"].)

In 1976, the Legislature amended former section 409.1 in two significant respects. First, it shifted the burden of proof from the party seeking to expunge the lis pendens to the party opposing the motion to expunge. And second, it reduced the standard of proof on the motion from clear and convincing to a preponderance of the evidence. (Stats. 1976, ch. 27, § 1, pp. 42-43; *Malcolm*, *supra*, 29 Cal.3d at p. 525.)

In *Malcolm*, however, the Supreme Court held that section 409.1, as amended in 1976, was not intended to transform a pretrial expungement

hearing into a "minitrial" on the merits of the underlying action. (*Malcolm, supra,* 29 Cal.3d at pp. 526-527.) The issue at the hearing, the court said, was whether the plaintiff had brought the action for a proper purpose, not whether there was merit to the plaintiff's claim. (*Id.* at p. 527.) Thus, a property owner whose title was clouded by a lis pendens still had no expeditious way to challenge the action giving rise to it, a situation that raised concerns the statutory scheme violated the owner's right to due process. (Cal. Lis Pendens Practice, *supra,* § 1.14, pp. 22-23.)

In 1992, following the efforts of a special committee of the Real Property Law Section of the California State Bar, the Legislature substantially revised the lis pendens statutes. Sections 409 to 409.9 were repealed and replaced by sections 405 to 405.61, effective January 1, 1993. (Stats. 1992, ch. 883, § 2, pp. 4100-4105.) The new sections were accompanied by the committee's comments, which were adopted by the bill's author as an expression of the Legislature's intent.

Under this new statutory scheme, a "[n]otice of pendency of action" (§ 405.2) properly recorded by a "party to an action who asserts a real property claim," i.e., a "claimant" (§ 405.1), is deemed to provide constructive notice of the claim to purchasers, encumbrancers, and other transferees of the property from the time the notice is recorded, and the claimant's rights and interest in the property, as ultimately determined in the pending action, will relate back to the date the notice was recorded (§ 405.24). A "real property claim" is defined in part as "the cause or causes of action in a pleading which would, if meritorious, affect (a) title to, or the right to possession of, specific real property . . . ." (§ 405.4.)

The 1992 revisions were intended, among other things, to overrule *Malcolm* and expand the grounds for expungement.

"1. . . . The former statute did not carefully distinguish between the concepts of adequate pleading of a claim justifying a lis pendens and the evidentiary merit of the claim. As a result, the courts [in *Malcolm* and its progeny] misconstrued the statutes to allow in effect recordation and maintenance of a lis pendens whenever the proponent's pleading was technically proper, regardless of whether the claim had factual merit. [Citations.]

"2. This section [defining a 'real property claim'] is new. It defines the type of claim which must be pleaded to support a lis pendens. If the pleading filed by the claimant does not properly plead a real property claim, the lis pendens must be expunged upon motion under [section] 405.31. If the claimant *does* plead a real property claim, but the claim pleaded has no

evidentiary merit, the lis pendens must be expunged upon motion under [section] 405.32. By expressly distinguishing the concepts of pleading and evidence in this fashion, the statute makes clear that factual merit is also necessary to the maintenance of a lis pendens. This section aids in distinguishing pleading from evidence."[7] (Code com., reprinted at 14 West's Ann. Code Civ. Proc. (2003 supp.) foll. § 405.4, p. 215, italics added; see also Code com. 1, 14 West's Ann. Code Civ. Proc., *supra*, foll. § 405.3, p. 214 ["The confusing rulings in *Malcolm* and its progeny reduced court review on a motion to expunge to little more than a demurrer-like examination of the adequacy of pleadings"].) Thus, a showing of good faith and a proper purpose are no longer sufficient to overcome a motion to expunge. The claimant must show a probably valid claim. (*Hunting World, Inc. v. Superior Court* (1994) 22 Cal.App.4th 67, 70 [26 Cal.Rptr.2d 923].)

The 1992 revisions also permit for the first time a nonparty affected by the notice of lis pendens to intervene in the underlying action, with leave of the court, to move for expungement. (§ 405.30.) And section 405.38 requires, rather than authorizes, the court to award attorney fees and costs to the prevailing party on a motion to expunge, unless it finds that the other party acted with substantial justification or that other circumstances would make the imposition of fees and costs unjust.

Also in 1992, the same year it revised the lis pendens statutes, the Legislature amended section 47 of the Civil Code to add subdivision (b)(3), now subdivision (b)(4), limiting in the case of lis pendens the absolute privilege accorded "publications" made in the course of judicial proceedings. The recordation of a lis pendens is a republication of the pleadings in the underlying action and so is subject to the absolute privilege in Civil Code section 47. (*Albertson v. Raboff* (1956) 46 Cal.2d 375, 379 [295 P.2d 405] (*Albertson*).)

"It is our opinion that the privilege applies to any publication, such as the recordation of a notice of *lis pendens*, that is required [citation] or permitted

---

[7]Section 405.31 provides in part: "In proceedings under this chapter, the court shall order the notice expunged if the court finds that the pleading on which the notice is based does not contain a real property claim. . . ."

Section 405.32 provides in part: "In proceedings under this chapter, the court shall order that the notice be expunged if the court finds that the claimant has not established by a preponderance of the evidence the probable validity of the real property claim. . . ." "Probable validity" means "it is more likely than not that the claimant will obtain a judgment against the defendant on the claim." (§ 405.3.)

A motion to expunge may include supporting declarations and documentary evidence. Moreover, the court may receive oral testimony at a hearing on the motion, and may permit any party affected by the motion to conduct discovery. (§ 405.30.)

The burden of proof on a motion to expunge under sections 405.31 and 405.32 rests in each case with the claimant. (§ 405.30.)

[citation] by law in the course of a judicial proceeding to achieve the objects of the litigation, even though the publication is made outside the courtroom and no function of the court or its officers is invoked. [Citation.] Thus, it is not limited to the pleadings, the oral or written evidence, to publications in open court or in briefs or affidavits. If the publication has a reasonable relation to the action and is permitted by law, the absolute privilege attaches. [Citations.] It therefore attaches to the recordation of a notice of *lis pendens*, for such a publication is permitted by law, and like other documents that may be filed in an action, it has a reasonable relation thereto and it is immaterial that it is recorded with the county recorder instead of being filed with the county clerk." (*Albertson, supra,* 46 Cal.2d at pp. 380-381; see also *Earp v. Nobmann* (1981) 122 Cal.App.3d 270, 281-282 [175 Cal.Rptr. 767] [enactment of §§ 409.1 to 409.6 in 1968 did not abrogate absolute privilege accorded lis pendens].)

Thus, because the recordation of a notice of lis pendens is absolutely privileged, the court held it cannot provide the basis for a cause of action for disparagement or slander of title, even if done with malice. (*Albertson, supra,* 46 Cal.2d at pp. 378-382.) The privilege, however, does not preclude an action for malicious prosecution of the underlying lawsuit. "The policy of encouraging free access to the courts that underlies the absolute privilege applicable in defamation actions is outweighed by the policy of affording redress for individual wrongs when the requirements of favorable termination, lack of probable cause, and malice are satisfied." (*Id.* at p. 382; *Silberg v. Anderson* (1990) 50 Cal.3d 205, 211-212 [266 Cal.Rptr. 638, 786 P.2d 365] [litigation privilege applies to all torts except malicious prosecution].) Moreover, evidence a lis pendens was recorded may be admissible to prove malice, and damages. (*Albertson, supra,* 46 Cal.2d at pp. 382-383.)

Similarly, in *Woodcourt II Limited v. McDonald Co.* (1981) 119 Cal.App.3d 245 [173 Cal.Rptr. 836] (*Woodcourt*), the court concluded, in reliance on *Albertson,* that the wrongful recordation of a notice of lis pendens cannot be the basis for causes of action for abuse of process or intentional interference with prospective economic advantage. (*Id.* at pp. 249-251.) In addition, notably, the court went on to hold that the recordation of a notice of lis pendens is not a "process" for purposes of a cause of action for abuse of process. (*Id.* at pp. 251-252.)

*Albertson*'s holding that the recordation of a notice of lis pendens is absolutely privileged has been "partially abrogated" by the 1992 amendment to Civil Code section 47. (*Wilton v. Mountain Wood Homeowners Assn.* (1993) 18 Cal.App.4th 565, 569, fn. 1 [22 Cal.Rptr.2d 471].) Civil Code section 47 now provides in pertinent part:

"A privileged publication or broadcast is one made: [¶] . . . [¶]

"(b) In any . . . (2) judicial proceeding, . . . except as follows: [¶] . . . [¶]

"(4) A recorded lis pendens is not a privileged publication unless it identifies an action previously filed with a court of competent jurisdiction which affects the title or right of possession of real property, as authorized or required by law."

Therefore, if the pleading filed by the claimant in the underlying action does not allege a real property claim, or the alleged claim lacks evidentiary merit, the lis pendens, in addition to being subject to expungement, is not privileged. It follows the lis pendens in that situation may be the basis for an action for slander of title. (See Cal. Lis Pendens Practice, *supra*, § 2.8, pp. 36-37; 5 Miller & Starr, Cal. Real Estate (3d ed. 2000) § 11:45, pp. 115-119; Greenwald & Asimow, Cal. Practice Guide: Real Property Transactions (The Rutter Group 2002) ¶ 11:608, p. 11-99.)

The existence of privilege is a defense to an action for defamation. Therefore, the burden is on the defendant to plead and prove the challenged publication was made under circumstances that conferred the privilege. (*Fairfield v. Hagan* (1967) 248 Cal.App.2d 194, 204 [56 Cal.Rptr. 402]; *Morcom v. San Francisco Shopping News* (1935) 4 Cal.App.2d 284, 288 [40 P.2d 940].) We now turn to the Zaklamas' specific claims with this background in mind.

### A. *Abuse of Process*

 As we have noted, Palmer and Yarber did not assert a cause of action for abuse of process in their first amended complaint. It is apparent from the record, however, that the parties and the court understood from the outset of the trial that this was one of the claims at issue; it was discussed in connection with the proposed jury instructions and the special verdict form without any objection from the Zaklamas, who raised the matter for the first time in their motion for new trial.

The Zaklamas now challenge the judgment on the ground the complaint failed to state facts sufficient to constitute a cause of action for abuse of process. That is, on the premise the complaint asserted this cause of action, they maintain it must fail because the recordation of a lis pendens is not a "process." (*Woodcourt*, *supra*, 119 Cal.App.3d at pp. 251-252.) Palmer and Yarber do not dispute (or even address) *Woodcourt*'s conclusion, but argue

in effect that the Zaklamas waived their objection by failing to raise it earlier.

However, the waiver doctrine does not apply to an objection that a complaint fails to state facts sufficient to constitute a cause of action. (§ 430.80.)[8] The recordation of a notice of lis pendens, even if done for an improper purpose, is not a valid basis for a cause of action for abuse of process, entirely apart from whether the recordation was privileged. (*Woodcourt, supra,* 119 Cal.App.3d at pp. 251-252.) Accordingly, the issue should not have been submitted to the jury, and its verdict holding the Zaklamas liable on this theory was error.

### B. *Slander of Title*

The Zaklamas, in reliance on *Albertson,* contend the complaint failed to state facts sufficient to constitute a cause of action for slander of title because the recordation of a lis pendens is absolutely privileged. However, as we have explained, the privilege does not attach unless the underlying action properly alleges a real property claim. (Civ. Code, § 47, subd. (b)(4).) Moreover, it was the Zaklamas' burden in this case to show that the collection and bankruptcy actions were such claims. This they failed to do. Indeed, the Zaklamas' attorney effectively conceded the collections action was not one in which it was appropriate to record a lis pendens. (See, e.g., *Allied Eastern Financial v. Goheen Enterprises* (1968) 265 Cal.App.2d 131, 133-134 [71 Cal.Rptr. 126] [action for money damages alone will not support a lis pendens].) And there is no evidence the trustee in the bankruptcy action actually attempted to set aside the sheriff's sale as a preferential transfer.

This same analysis also disposes of the Zaklamas' claim a lis pendens, inasmuch as it simply puts the world on notice of a pending action, is not a false publication. It is false, however, if it asserts the action may affect the title to or possession of real property, when in fact it will not.

### C. *Malicious Prosecution*

The Zaklamas argue the evidence fails to support the jury's verdict finding Esmat liable for malicious prosecution.

"The common law tort of malicious prosecution originated as a remedy for an individual who had been subjected to a maliciously instituted

---

[8]Section 430.80, subdivision (a), states: "If the party against whom a complaint or cross-complaint has been filed fails to object to the pleading, either by demurrer or answer, that party is deemed to have waived the objection unless it is an objection that the court has no jurisdiction of the subject of the cause of action alleged in the pleading or an objection that the pleading does not state facts sufficient to constitute a cause of action."

1382

criminal charge, but in California, as in most common law jurisdictions, the tort was long ago extended to afford a remedy for the malicious prosecution of a civil action. [Citations.] Under the governing authorities, in order to establish a cause of action for malicious prosecution of either a criminal or civil proceeding, a plaintiff must demonstrate 'that the prior action (1) was commenced by or at the direction of the defendant and was pursued to a legal termination in his, plaintiff's, favor [citations]; (2) was brought without probable cause [citations]; and (3) was initiated with malice [citations].' [Citations.]" (*Sheldon Appel Co. v. Albert & Oliker* (1989) 47 Cal.3d 863, 871-872 [254 Cal.Rptr. 336, 765 P.2d 498] (*Sheldon Appel*), quoting *Bertero v. National General Corp.* (1974) 13 Cal.3d 43, 50 [118 Cal.Rptr. 184, 529 P.2d 608, 65 A.L.R.3d 878].) ▌ They contend in particular there is no substantial evidence Esmat lacked probable cause to file the federal civil rights action against Palmer and Yarber. Put another way, they maintain Esmat's good faith reliance on his attorneys' advice was sufficient to establish probable cause.

To be clear, we understand Palmer and Yarber's malicious prosecution claim to be limited to the civil rights action. The Zaklamas filed a total of five lawsuits that affected Palmer and Yarber in some way: two in which Palmer and Yarber were defendants but where lis pendens were not recorded (the false arrest and furniture storage actions); two in which Palmer and Yarber were not defendants but where lis pendens were recorded (the collection and bankruptcy actions); and one (the civil rights action) where Palmer and Yarber were defendants *and* a lis pendens was recorded. Therefore, we are not being a[sked] to decide whether the wrongful recordation of a lis pendens may be the [bas]is for a malicious prosecution claim when the affected property owner[s a]re *not* defendants in the underlying action. (See *Albertson, supra,* 46 Ca[l.3d] at p. 382 [lis pendens may be an *element* of a cause of action for mali[cious] prosecution]; 5 Witkin, Summary of Cal. Law (9th ed. 2002 supp.) To[rts, §] 437C, pp. 338-341.)

Moreover, we underst[and] the present question to be whether Esmat had probable cause to file the [civi]l rights action, versus whether he had probable cause to record the lis pe[ndens]. That is, there appears to be no dispute the civil rights action asserte[d a "]real property claim," in which case Esmat was justified in recording the l[is pen]dens unless the civil rights action was legally or factually untenable. (*A*[... v.] *Silva & Silva Enterprises Corp.* (1999) 77 Cal.App.4th 152, 156-15[7 ... ] Cal.Rptr.2d 433]; *Puryear v. Golden Bear Ins. Co.* (1998) 66 Cal.App.4[th] 188, 1195-1197 [78 Cal.Rptr.2d 507] (*Puryear*).)

Both parties frame their [res]ponse to this last question in terms of whether Esmat was, or should have [be]en, aware of section 701.680, subdivision (a),

which provides that, with a few limited exceptions, a sale of property to satisfy a judgment is final and may not be set aside for any reason. (See fn. 4, *ante.*) This, however, is an issue of legal not factual tenability, and therefore is a matter for the court rather than the jury to decide. (*Sheldon Appel, supra,* 47 Cal.3d at pp. 874-877.) The issue here is not whether Esmat should be held to have known the law, but whether the civil rights action was "founded on facts sufficient to support [an objectively] reasonable belief that the evidence will sustain a favorable judgment," or at least a reasonable belief that such evidence exists. (*Puryear, supra,* 66 Cal.App.4th at p. 1195.)

The civil rights action was based on the theory Palmer and Yarber were "in cahoots" with Sykora, RPM, and the sheriff to conceal the fact that they (Palmer and Yarber) were taking title to the Panorama house for the benefit of Sykora and RPM, so as to avoid the exception to section 760.680 that applies when the property is sold to the judgment creditor. Esmat admitted, however, this was merely his suspicion and he had no evidence whatsoever to support it. It would have been abundantly reasonable for the jury to conclude under the circumstances that Esmat therefore lacked probable cause to file the civil rights action.

Esmat's claim he was merely acting on the advice of his attorneys does not change the analysis. ■ " 'Probable cause may be established by the defendants in a malicious institution proceeding when they prove that they have in good faith consulted a lawyer, have stated all the facts to him, have been advised by the lawyer that they have a good cause of action and have honestly acted upon the advice of the lawyer.' [Citations.]"[9] (*DeRosa v. Transamerica Title Ins. Co.* (1989) 213 Cal.App.3d 1390, 1397-1398 [262 Cal.Rptr. 370]; 5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 449, pp. 533-534.)

Conversely, if the defendant acted in bad faith or withheld facts from counsel he or she knew or should have known would have defeated the cause of action, probable cause is not established. "[C]ounsel's advice must be sought in good faith [citation] and '. . . not as a mere cloak to protect one against a suit for malicious prosecution.' [Citation.]" (*Bertero v. National General Corp., supra,* 13 Cal.3d 43, 54.) The burden of proving good faith

---

[9]The jury was instructed accordingly, pursuant to BAJI No. 7.36: "If you find that the defendant in good faith sought the advice of an attorney before commencing or maintaining the civil proceeding against plaintiff[s], and made a full, fair and complete disclosure to such attorney of all the pertinent and material facts of which the defendant had knowledge tending to prove or disprove the civil allegations and, therefore, the defendant acted upon the advice of the attorney and in the belief of plaintiffs' civil liability for the alleged wrong, then you must find that there was probable cause in commencing or maintaining the civil proceeding against the plaintiff[s]."

reliance on the advice of counsel falls on the party asserting the defense. (*Ibid.*) ██ Because, as we have said, Esmat lacked any evidence of a conspiracy, the jury reasonably could have concluded he had not acted in good faith.

Finally, Esmat contends the court erred in refusing his request to instruct the jury pursuant to BAJI No. 7.33, which instruction is designed to set out the specific facts that the defendant asserts establish probable cause. Here, Esmat sought to establish probable cause based on advice of counsel. The jury was properly instructed on that theory. (See Use Note to BAJI No. 7.33 (8th ed. 1998) p. 339 ["If advice of counsel is urged as the defense, and the facts are disputed, BAJI 7.36 [advice of counsel] can be used in lieu of this instruction"].)

D., E.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## III. CONCLUSION

In summary, we find no error except insofar as the Zaklamas were found liable for abuse of process. And we conclude this error could have had no effect on the judgment. The causes of action for slander of title and abuse of process were based on the very same conduct. Nothing in the complaint, the evidence, the jury instructions, or the verdict form distinguished between them in terms of the underlying conduct or the resulting damages. Therefore, we will strike that cause of action and affirm the judgment.

## IV. DISPOSITION

Those portions of the special verdict form finding the Zaklamas liable for abuse of process are stricken. The judgment is affirmed in all other respects. Costs are awarded to respondents.

Dibiaso, Acting P. J., and Cornell, J., concurred.

Appellants' petition for review by the Supreme Court was denied October 22, 2003. Brown, J., did not participate therein.

---

*See footnote, *ante*, page 1367.