## CIRCUIT COURT OF FAIRFAX COUNTY

Bison Building Co., L.L.C.

v.

William N. Brown

April 5, 2006

Case No. (Law) 2005-1104

BY JUDGE ARTHUR B. VIEREGG

 This action, *Bison Building Co., L.L.C. v. William N. Brown*, was tried before me *ore tenus* beginning on March 6, 2006. Plaintiff, Bison Building Company, L.L.C. ("Bison Builders") filed a three count motion for judgment against Defendant William Brown arising out of a contract between the parties for Brown to purchase a portion of a 6.2 acre parcel, which parcel is hereinafter referred to as "Hastings Crest," and Brown's conduct in filing a *lis pendens* among the Fairfax County land records affording notice of his pending suit for specific performance to require Bison Builders to convey a portion of the Hastings Crest parcel to him.

*The Causes of Action Pleaded*

 In its motion for judgment, Bison Builders pleaded three causes of action. In Count I, Bison Builders alleged that Brown wrongfully terminated the contract, for which he is liable for compensatory damages. In Count II, Bison Builders alleged that Brown had slandered Bison Builders's title to Hastings Crest by filing a *lis pendens*, for which Brown is liable for compensatory damages. In Count III, Bison Builders alleged that, by filing the *lis pendens*, Brown had interfered with other contracts Bison Builders had

made to sell other portions of the Hastings Crest parcel, for which Brown is liable for compensatory damages. Bison Builders also sought an award of punitive damages.

Brown filed a counterclaim seeking a declaratory adjudication that Bison Builders breached the parties' contract, that Brown was excused from performance, and that he had properly terminated the contract. He also sought the return of his $10,000 down payment posted as a deposit to be applied as part of the purchase price for the Lot 1. Both parties sought attorney's fees pursuant to Paragraph 23 of the contract. *See* J. Ex. 3.

After three days of trial, I took the case under advisement. My decision follows.

## Background

In July 2003, Bison Builders, a custom home building company, entered into a contract with Darcy Sekas, manager of Colvin Run, L.L.C., to purchase Hastings Crest, a 6.2 acre parcel located on Colvin Run Road in the Great Falls area of Fairfax County, Virginia. The purchase price was $2.1 million. Hastings Crest was zoned R-1. A "turn of the century historic home" was situated on the property. Colvin Run, L.L.C., had theretofore obtained a variance permitting the property to be subdivided into four lots. *See* J. Ex. 17. However, in order to record the subdivision plan among the Fairfax County land records, which recordation was necessary for the subdivision plan to become effective, Bison Builders, as contract purchaser, was required to post a $213,000 public improvements bond in favor of Fairfax County. *See* J. Ex. 32

On October 27, 2003, before closing its purchase of Hastings Crest and despite the fact that the Hastings Crest subdivision plan had not been recorded, Bison Builders listed the Hastings Crest lots for sale with a realtor, Long & Foster Real Estate ("Long & Foster"). In the listing, "Lot 1" was described as consisting of one acre. The "turn of the century historic home" was described as being "habitable."[1] *See* J. Ex. 20.

In early 2004, Brown had begun a search to find and purchase real property that was improved with a residence. Stuart Franklin, a friend knowledgeable about real property, and Vanessa Vergnetti, a realtor with Weichert Realty, assisted him in this quest. Ms. Vergnetti reviewed the Long

---

[1] American Home Inspections, L.L.C., conducted an inspection of the home on January 7, 2004. *See* J. Ex. 21. While several repairs were indicated, the inspection report did *not* indicate that the home was uninhabitable. *See id.*

& Foster listing for Lot 1, Hastings Crest, and visited the site. While at the property, she telephoned a Long & Foster agent, who furnished information as to the anticipated boundaries of Lot 1. On March 27, 2004, Brown visited the property with Mr. Franklin. Both concurred Lot 1 met Brown's criteria; it consisted of between one and one and one-half acres and was improved by a habitable dwelling. Later that day, Brown entered into a contract with Bison Builders to buy Lot 1. The contract, prepared by Weichert Realtors, identified the property to be purchased only by reference to the Fairfax County tax map for the entirety of the unsubdivided 6.2 acre Hastings Crest parcel. It did not specifically identify Lot 1. The contract also specified that the property was to be sold "as is." It stipulated a closing date of April 27, 2004. Both parties covenanted that "time was of the essence" of their agreement. *See* J. Ex. 3.

During the month of April 2004, Brown learned that Bison Builders had not yet acquired legal title to Hastings Crest and, therefore, could not convey Lot 1 to him. Colvin Run, L.L.C., did eventually convey title to Hastings Crest to Bison Builders the following month.

In May 2004, to finance its purchase of Hastings Crest, Bison Builders had borrowed $2.1 million from Access Bank. Becoming due in late August 2004, it was referred to in trial as "a bridge loan." Although the Access bridge loan enabled Bison Builders to become the record owner of Hastings Crest, Bison Builders was unable to record the subdivision plan because it had not filed the public improvements bond required by Fairfax County, a condition precedent to recordation of the subdivision plan. Therefore, at all times between May and late December 2004, Bison Builder was continuously unable to convey any of the proposed Hastings Crest lots to contract purchasers, including Brown. Bison Builders's failure to convey lots and pay the bridge loan had caused Access Bank to declare its bridge loan in default in September 2004. Access Bank thereafter entered into an agreement with Bison Builders not to enforce its foreclosure rights until December 24, 2004. *See* J. Ex. 50. However, on or about January 19, 2005, the bank decided to sell its loan to Bison Builders's other subordinated lender. This eventuated in Bison Builders's payment of a higher interest rate on the re-structured lending arrangements.

Despite Bison Builders's continued inability to convey Lot 1 to him from April to late December 2004, Brown, still wishing to buy Lot 1, elected not to terminate the parties' contract for the conveyance of Lot 1. Nevertheless, in October, 2004, Brown authorized his attorney Mr. Gregory Counts to file a suit to require Bison Builders to convey Lot 1 to him and to file a *lis pendens* against the entire 6.2 acre Hastings Crest property. In the

specific performance suit, Brown alleged that the property at issue was worth $2.1 million, even though he understood that he had only sought to purchase a portion of the property, Lot 1, for $699,000.

The Hastings Crest subdivision plan was finally recorded among the Fairfax County land records on December 28, 2004. *See* J. Ex. 148. Bison Builders thereupon made an immediate demand on Brown to proceed to settlement on Thursday, December 30, 2004. *See id.* On January 3, 2005, Bison Builders issued a Notice of Default to Brown, threatening an action for damages if settlement was not completed by January 7, 2005. *See* J. Ex. 62. In response, Brown, through Mr. Counts, expressed his continuing desire to close his purchase of Lot 1. After further communications between the parties' respective attorneys, which included, *inter alia*, Brown's inquiry whether the subdivision plan had been recorded, Mr. Counts confirmed in a January 12, 2005, letter, that Brown would settle within two to four weeks. *See* J. Ex. 72.

Meanwhile, on or about January 1, 2004, the dwelling on Lot 1 suffered excessive flooding and water damage. On account of a burst water pipe, wood floors had buckled, the interior walls had collapsed, and the ceiling had caved in. The house required significant and expensive remedial work to again be made habitable. In a follow up inspection on July 12, 2005, American Home Inspections, L.L.C., stated that "[a] demolition permit to level the structure is warranted." *See* J. Ex. 21. During the January negotiations, Bison Builders intentionally failed to reveal the flooding to Mr. Counts or Brown.

Nevertheless, Brown eventually learned of the water damage after Mr. Franklin inspected the Lot 1 dwelling when Brown was out of town. Brown apprised Bison Builders of his knowledge of the damaged dwelling and demanded that Bison Builders fix the property. *See* J. Ex. 85. Mr. Tripp, as Bison Builders's attorney and agent, responded, unequivocally repudiating any duty on the part of Bison Builders to restore the dwelling before closing and refused to countenance postponement of the settlement. *See* J. Ex. 87. After receiving Bison Builders's rejection of Brown's demand, Brown terminated the contract on February 9, 2005. On the same day, Brown released the *lis pendens* which remained on Lot 1.

In addition to the above chronology, evidence was also presented related to damages claimed by Bison Builders against Brown. By late December 2004, in addition to its contract with Brown, Bison Builders had also entered into an executory contract to convey Lot 4 of Hastings Crest to Mr. Haksong Jin. Pursuant to the contract terms, Mr. Jin and Bison Builders agreed that closing would take place on January 15, 2005. *See* Ex. 96. At trial,

Bison Builders's President, Gideon Frishman, testified that Brown's *lis pendens* filing had caused Jin not to close his contract on January 15, 2005. However, Mr. Jin did not testify at trial. No exhibits related to Jin's specific reasons for failing to settle were presented. Nor was evidence presented that showed whether or not Jin ever knew that the *lis pendens* had been released on January 11, 2005, as to the Hastings Crest lots except Lot 1.

## Decision

### I. *Breach of Contract*

In *Ulloa v. QSP, Inc.*, the Supreme Court stated "the elements of a breach of contract action are (1) a legally enforceable obligation of a defendant to a plaintiff, (2) the defendant's violation or breach of that obligation, and (3) injury or damage to the plaintiff caused by the breach of obligation." 271 Va. 72, 79 (2006) (quoting *Filak v. George*, 267 Va. 612, 619 (2004)).

Here, the parties entered into a contract for Bison Builders to sell and for Brown to buy Lot 1 of the anticipated subdivision of Hastings Crest. Pursuant to the terms of their contract, Bison Builders covenanted to transfer Lot 1 to Brown on April 24, 2004. Time was stipulated as being of the essence of the contract. Thus, this closing date was a material term of the parties' agreement. Nevertheless, Brown waived this contract breach by Bison Builders.

However, the parties' contract also stipulated that Bison Builders would deliver the dwelling on Lot 1 as it was April 24, 2004. Brown never waived this provision of the parties' contract. Upon discovering the water damage, Brown refused to settle the parties' contract unless Bison Builders first restored the dwelling to its pre-New Year's Eve flooding condition. Only when Bison Builders insisted on a closing and refused to restore the dwelling did Brown terminate the contract.

The decisive issue in this case is not whether a breach of contract was committed. Plainly several occurred. The question is which party breached first, thereby excusing the other party from performance. Bison Builders alleged Brown breached by not going to settlement immediately upon demand on December 30, 2004. However, as Bison Builders had been unable to deliver the property on the original date specified in the parties' contract and no new term had been agreed to by the parties, Brown's only obligation was to settle in a reasonable period of time. *Cf. Figman v. Davis*, 23 Va. Cir. 546,

550 (1989) (finding that the complainant had a duty to settle in a reasonable period of time or by the date stated in the contract); *Norfolk & W. Ry. v. Duke & Rudacille*, 107 Va. 764, 768 (1908) (holding that, where a contract failed to specify a time for ties to be delivered, the law would imply that they were to be delivered within a reasonable time). Two days patently was not a reasonable period of time.

Furthermore, following Bison Builders's demand to go to settlement, Brown sought to secure financing to close the transaction as quickly as possible. Brown kept in constant communication with Bison Builders through his attorney, Mr. Counts. Brown did not demonstrate an unwillingness to settle until he learned of the New Year's Eve water damage to the dwelling on Lot 1.

Conversely, Bison Builders unequivocally refused to perform its duty to deliver the dwelling on Lot 1 in its condition on March 27, 2004. *See* J. Ex. 87. Bison Builders's repudiation of its contractual duties constituted a material breach of the parties' contract and excused Brown from closing the sale of Lot 1. *See Simpson v. Scott*, 189 Va. 392, 397-98 (1949) ("The rights of a party to a bilateral contract of mutually dependent promises upon an anticipatory repudiation by the other party will then be: (1) to rescind the contract altogether, (2) to elect to treat the repudiation as a breach, either by bringing suit promptly, or by making some change of position, or (3) to await the time for performance of the contract and bring suit after that time has arrived."). As Justice Kinser declared in *Countryside Orthodontics, P.C. v. Peyton*:

> Generally, a party who commits the first breach of a contract is not entitled to enforce the contract. There is, however, an exception to that general rule when the breach did not go to the "root of the contract" but only to a minor part of the consideration. Nevertheless, when the first breaching party commits a material breach, that party cannot enforce the contract. A material breach is a failure to do something that is so fundamental to the contract that the failure to perform that obligation defeats an essential purpose of the contract.

261 Va. 142, 154 (citing, *inter alia, Neely v. White*, Va. 358, 366-67 (1941)). In *Neely*, the Court quoted with approval the following principle enunciated in 12 Am. Jur., *Contracts*, § 360:

It does not follow in every case of mutual and dependent promises that, upon a failure of one party to perform his promise, the other party will be exonerated or excused from performing his promise. Before partial failure of performance of one party will excuse the other from performing his contract or give him a right of rescission, the act failed to be performed must go to the root of the contract.

"It is firmly established that for a repudiation of a contract to constitute a breach, the repudiation must be clear, absolute, unequivocal, and must cover the entire performance of the contract." *Vahabzadeh v. Mooney*, 241 Va. 47, 51 (1991). In the case at bar, in response to Brown's request for repairs[2] of the water damage, Mr. Tripp stated, "we *will not* agree to a reduction in the purchase price for the water and ceiling damage you are alleging. . . . Bison will discuss repairing the damage for [Brown], but *only after settlement*." J. Ex. 87 (emphasis added). Bison Builders's refusal to deliver the property as it was on March 27 could not have been more "clear and absolute." *See Vahabzadeh*, 241 Va. at 51.

Moreover, Bison Builders's repudiation went to the "root" of the contract. *See Peyton*, 261 Va. at 154. Brown contracted to purchase a habitable home. The burst water pipe, which caused an estimated $20,000 of damage and which warped the floors and collapsed the ceilings, did not plausibly constitute merely a "minor part of the consideration" of the parties' agreement in this case. *See id.* These damages rendered the house uninhabitable.[3] Brown testified, and the contract itself provided, that the house would be used as Brown's principal residence. *See* J. Ex. 3.[4] Since Bison

---

[2] Mr. Tripp's contentions during oral argument that Bison Builders viewed these requests as a negotiation tactic are both irrelevant and not borne out by the evidence. The letter from Mr. Counts to Mr. Tripp makes plain that, regardless of any other dickering between the two parties, Brown desired that the burst water pipe and subsequent damage be repaired. *See* J. Ex. 85.

[3] Bison Builders places a great deal of weight upon the fact that this house was, in the colloquial, "a real fixer upper." However, despite its myriad problems, it was habitable at the time the contract was entered between Bison Builders and Brown; an inspection conducted of the home when Bison Builders originally purchased it found to be so, *see* J. Ex. 21, and there was no evidence presented that any change occurred rendering the house uninhabitable between that time and the time Brown entered his contract.

[4] Though Bison Builders's counsel contended in argument that the dwelling was to be demolished, no evidence to that effect was presented, apart from an unsubstantiated letter from Mr. Tripp to Mr. Counts. *See* J. Ex. 87.

Builders repudiated a material terms of the parties' agreement for the sale of Lot 1 of Hastings Crest, Brown was excused from performance. *See Simpson*, 189 Va. at 397-98.

Bison Builders accordingly failed to prove that Brown breached that contract.

## II. *Slander of Title*

The cause of action for slander of title is explained in 50 American Jurisprudence, Second, as follows:

> One who maliciously publishes false matter which brings into question or disparages the title to property, thereby causing special damage to the owner, may be held liable in a civil action for damages. The essential elements of the cause of action . . . are the uttering and publication of the slanderous words by the defendant, the falsity of the words, malice, and special damages. The action is not for the words spoken, but for special damages for the loss sustained by reason of the speaking and publication of the slander.

50 Am. Jur. 2d, § 550 (2006); *see also Wright v. Castles*, 218 Va. 218, 224 (1986) (To prove slander of title, a plaintiff must show that the defendant with malice or in reckless disregard of the truth or falsity of the statements made them.).

In the broader context of defamation, malice is defined as follows:

> some sinister or corrupt motive such as hatred, revenge, personal spite, ill will, or desire to injure the plaintiff; or what, as a matter of law, is equivalent to malice, that the communication was made with such gross indifference and recklessness as to amount to a wanton or willful disregard of the rights of the plaintiff.

*Great Coastal Express, Inc. v. Ellington*, 230 Va. 142, 149, n. 3 (1985) (quoting *Preston v. Land*, 220 Va. 118, 120-21 (1979)).

Before reaching the merits of the Bison Builders's claim, a threshold issue of whether or not the supposed defamatory statement is privileged must be addressed. Bison Builders has alleged that the slanderous words in this case were those contained in the *lis pendens* filed on behalf of Brown by his

attorney in connection with his lawsuit. The Virginia Supreme Court has not addressed whether a privilege attaches to a *lis pendens* filed in connection with a slander of title action. Thus, it is an issue of first impression.

In other jurisdictions where *lis pendens* are filed in connection with litigation and statements made during judicial proceedings are afforded an absolute privilege, courts have extended that privilege to cover *lis pendens*. *See, e.g., Palmer v. Zaklama*, 109 Cal. App. 4th 1367, 1378-79 (2003) ("Privilege applies to any publication . . . that is permitted . . . by law in the course of a judicial proceeding to achieve the objects of the litigation, even though the publication is made outside the courtroom. . . . Absolute privilege . . . therefore attaches to the recordation of a notice of *lis pendens*, for such a publication is permitted by law."); *Ringier Am. v. Enviro-Technics*, 284 Ill. App. 3d 1102, 1105-06 (1996) ("Nearly every jurisdiction to consider the question has extended the absolute privilege accorded statements made in the course of litigation to include the filing and/or recording of a *lis pendens* notice, provided the underlying litigation makes allegations affecting some ownership interest in the subject property."); *cf. Kensington Dev. Corp. v. Israel*, 139 Wis. 2d 159, 167 (1987) (finding that, where the tort of slander of title was codified, only a qualified privilege attached to the *lis pendens* at issue).

The Virginia Supreme Court has held that the sole purpose of a *lis pendens* is to provide notice of the impending lawsuit. *See Green Hill Corp. v. Kim*, 842 F.2d 742, 744 (4th Cir. 1988) (quoting *Bray v. Landergren*, 161 Va. 699, 713 (1934) ("A *lis pendens* is not a seizure. It is restrictive only and but serves to warn others that rights which they may acquire will be subject to any valid judgment entered.")). The Supreme Court has also stated that "it is well settled that words spoken or written in a judicial proceeding that are relevant and pertinent to the matter under inquiry are absolutely privileged." *Donohoe Constr. Co. v. Mt. Vernon Associates*, 235 Va. 531, 537 (1988). In that case, the Court declared:

> Although courts may differ in determining when a proceeding is "judicial," the rule of absolute privilege accorded judicial proceedings is not limited to trials. Indeed, "the rule is broad and comprehensive, including within its scope all proceedings of a judicial nature," and includes "any proceeding for the purpose of obtaining such remedy as the law allows."

*Id.* (internal citations omitted).

Since a memorandum of *lis pendens* can do no more than recite what is already contained in the pending litigation, and, since judicial proceedings are afforded an absolute privilege, it follows that a *lis pendens* should be afforded the same privilege as any other "words spoken or written in a judicial proceeding." *See Donohoe Constr. Co.*, 235 Va. at 537; *Bray*, 161 Va. at 713; *Palmer*, 109 Cal. App. 4th at 1378-79.

Yet even if the *lis pendens* in this case were afforded a qualified privilege[5] or no privilege at all, Bison Builders nevertheless failed to meet its burden to prove virtually all of the elements of a slander of title action. It should be noted that Brown *can* be held liable for this intentional tort based upon the actions of his attorney in filing the *lis pendens*. In *Flippo v. CSC Assocs. III, L.L.C.*, the Supreme Court stated that reliance on the advice of one's attorney "generally has been treated only as an appropriate factor to consider in determining whether the requisite malice or wantonness needed to impose punitive damages has been shown." 262 Va. 48, 51 (2001). The Court concluded that reliance upon such advice is "relevant, but not an absolute defense." *See id; cf. Pallas v. Zaharopoulos*, 219 Va. 751, 755 (1979). In *Pallas*, the Court held that "when a defendant, in initiating a prosecution, acts in good faith upon the advice of reputable counsel, after a full disclosure of all material facts, he has probable cause to support his action. Probable cause serves as a complete defense to an action for malicious prosecution, even if the advice given by the attorney is wrong." Accordingly, Brown's reliance on the advice of his attorney, Mr. Counts, in drafting his *lis pendens* does *not* exculpate him from the allegation that he committed the tort of slander of title.

First, when Brown filed his lawsuit and *lis pendens*, the land at issue was not subdivided. The only reference in the poorly drafted contract at issue was to a tax map for the entire property and not to Brown's parcel alone. Further, Brown and Mr. Counts had no basis for alleging Brown's interest was worth $2.1 million, especially given Brown's contract price of $699,000. However, since the property had not been subdivided at the time Brown filed suit, he could only have indexed his *lis pendens* with reference to the entire property. *Cf.* Va. Code § 15.2-2254 (forbidding landowners from subdividing property without the explicit authorization of the local planning commission). The Colvin Run, L.L.C./Bison Builders's contract fairly established the value of the entire Hastings Crest property as being worth $2.1 million. No evidence

[5] A qualified privilege can be defeated upon proof of common law malice. *See Great Coastal Express*, 230 Va. at 154.

was actually presented as to the value of either Hastings Crest's 6.2 acres or Lot 1 alone. Thus, the statement that Brown filed a lawsuit seeking specific performance of the property at issue or seeking recovery of $2.1 million dollars from Bison Builders, L.L.C.[6] [sic] was not false.

Furthermore, as the *Wright* Court made plain, the plaintiff in a slander of title case bears the additional burden of proving that the defendant's actions caused him damages. *See Wright*, 232 Va. at 224. In their motion for judgment and again in oral arguments, Bison Builders claimed that Brown's actions caused another contract purchaser, Mr. Haksong Jin, not to close on his purchase of another Hastings Crest lot on January 15, 2005. Bison Builders further contended that, because Mr. Jin did not settle, Access Bank sold Bison Builders's loan to Mr. Long, which sale in turn resulted in an interest rate increase, for which it sought damages. The only evidence presented of these alleged damages was the highly unspecific and conclusory testimony of Mr. Gideon Frishman, who was by no means a disinterested witness. Absent testimony from Mr. Jin or another disinterested witness, Mr. Frishman's testimony is wholly insufficient to prove the damages alleged.

Yet even if it is assumed that Mr. Frishman's testimony about Mr. Jin's state of mind was accurate to evaluate the propriety or impropriety of Mr. Jin's initial refusal to settle, it is necessary to evaluate the terms of Mr. Jin's contract. Like the contract of Brown, however, Mr. Jin's contract contained a clause stating that time was of the essence. *See* J. Ex. 96. Additionally, the contract contained various provisions addressing the obligations of each party should a breach occur. *See id.* Bison Builders presented no evidence that Mr. Jin had any legal basis for failing to close his contract. Thus, Mr. Frishman's remedy for Mr. Jin's nonperformance on January 15, 2005, was against Mr. Jin and *not* Brown.

Nor was evidence introduced demonstrating that Mr. Jin's settlement alone would have saved the Bison Builders's loan from being sold to Mr. Long. Indeed, the evidence showed a troubled history between Bison Builders and Access Bank. Bison Builders first defaulted on its loan on September 1, 2004, and, at the time this cause of action arose, was operating under an troubled history between Bison Builders and Access Bank. Bison Builders first defaulted on its loan on September 1, 2004, and, at the time this cause of

---

[6] The fact that the lawsuit technically named the wrong party further defeats the plaintiff's argument. If the plaintiff is also known as "Bison Builders, L.L.C.," then the error is a distinction without a difference. If Bison Builders, L.L.C., is an entirely different entity, then it is that entity and not the plaintiff who has standing to bring this action.

action arose, was operating under an agreement that the bank was closely monitoring. Both Ms. Jacobsen and Mr. Shoemaker testified that the bank required two of the subdivided pieces of property to settle more or less simultaneously in order for the loan not to be foreclosed. Though Mr. Shoemaker also testified "we would have looked favorably on one settlement," there is nothing in the record to indicate that Access Bank would *not* have sold the loan to Mr. Long but for the failure of Mr. Jin to close. Indeed, if Mr. Jin did close, and Brown still did not, it is speculative whether or not the bank would have continued its relationship with Bison Builders. Because of the uncertainties that pervaded Bison Builders's evidence, it failed to prove damages by a preponderance of the evidence presented.

Accordingly, for the foregoing reasons, Bison Builders's slander of title claim fails.

### III. *Tortious Interference*

Bison Builders's interference with contract claim is grounded on the premise that Brown's memorandum of *lis pendens* interfered with Bison Builders's executory contracts with other buyers of Hastings Crest lots.

The elements of tortious interference are "(1) the existence of a valid contractual relationship or business expectancy, (2) knowledge of the relationship or expectancy on the part of the interferor, (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy, and (4) resultant damage to the party whose relationship or expectancy has been disrupted." *See Chaves v. Johnson*, 230 Va. 112, 120 (1985). This count fails on almost all of the aforementioned elements.

The only contract that Bison Builders alleged Brown might have interfered with was that of Mr. Jin. Even if it is assumed that Mr. Jin refused to close his contract on account of Brown's *lis pendens*, no evidence was presented that Brown knew of Mr. Jin's contract with Bison Builders. Moreover, Bison Builders conceded during oral argument that Brown did not form the specific intent to interfere with any one contract. Finally, as discussed earlier, Bison Builders did not prove any damage suffered as a consequence of Brown's *lis pendens* filing.

Therefore, Bison Builders also failed to sustain its burden of proving its interference with contract claim.

360

## IV. *Counterclaim*

Brown's counterclaim seeks a declaratory judgment that Brown breached the parties' real estate contract for the purchase of Lot 1 and his right to a return of his $10,000 deposit presently held by Weichert Realtors. Since Brown sustained his burden of proving that Bison Builders breached the parties' contract by repudiating its contractual duty to restore the dwelling on Lot 1 to its condition at time of contract, Brown is entitled to the foregoing relief sought.

In addition, he claims an award of attorney's fees. Paragraph 23 states "in any action or proceeding involving a dispute between the Purchaser and the Seller arising out of this contract, the prevailing party will be entitled to receive from the other party reasonable attorney's fees to be determined by the court. . . ." Therefore, pursuant to the parties' contract, as the prevailing party in this action, Brown is entitled to his reasonable fees, which I shall determine. After reviewing Brown's evidence as to attorney's fees and costs recoverable, I find that he is entitled to an award of $72,168.00. In arriving at this figure, I have not awarded Brown the time billed by his expert, Mr. Neil Title, for his presence during the trial apart from his time testifying. Furthermore, I have not awarded any of Mr. Count's fees, because the reasonableness and necessity of those fees was not supported by expert testimony.

## *Conclusion*

For the foregoing reasons, I find that Bison Builders failed to prove the elements of any of the causes of action pleaded in its motion for judgment. Accordingly, each of those actions is dismissed with prejudice. I find that Brown did sustain his burden of proving his entitlement to declaratory relief, both (1) that Bison Builders breached the parties' real estate contract for the purchase of Lot 1 by its repudiation of its obligation to deliver the dwelling on the property in its condition as of the date of the contract and (2) that, as between the parties, he is entitled to the return of his $10,000 deposit made pursuant to that contract. Finally, I award Brown a judgment against Bison Builders for attorney's fees and costs of $72,168.00.