Filed 11/3/15  Harrison v. Dourec CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| RICHARD HARRISON et al.,<br><br>Plaintiffs and Appellants,<br><br>v.<br><br>RACHEL DOUREC as Trustee, etc.,<br><br>Defendant and Appellant; | B255832<br>(Los Angeles County<br>Super. Ct. No. BP132350) |
| RICHARD HARRISON et al.,<br><br>Plaintiffs and Appellants,<br><br>v.<br><br>RACHEL DOUREC as Trustee, etc.,<br><br>Defendant and Appellant;<br><br>KENNETH S. WOLF,<br><br>Defendant and Respondent. | B257352<br>(Los Angeles County<br>Super. Ct. No. BP132675) |

APPEAL from an order of the Superior Court of Los Angeles County, Mitchell L. Beckloff, Judge.  Affirmed.

Richard Ross and Mitchell Keiter, for Plaintiffs and Appellants Richard Ross, Gary Storer, Daniel Storer, Sebastian Harrison and Richard Harrison.

Hoffman, Sabban & Watenmaker and Kenneth S. Wolf for Defendant and Appellant Rachel Dourec.

Meyers McConnell Reisz Siderman, Frederick S. Reisz and S. Seth Kershaw for Defendant and Respondent Kenneth S. Wolf.

_____

Appellants Richard Ross, Gary Storer, his son Daniel Storer, and siblings Sebastian and Richard Harrison, beneficiaries under the Zeltonoga Family Trust, filed two petitions in probate:  one, naming respondent and cross-appellant Rachel Dourec as an individual and as the sole trustee, sought to invalidate the most recent version of the trust on various grounds, including forgery and undue influence; the other sought damages from certain individuals, including respondent Kenneth Wolf, the attorney responsible for preparing the purportedly invalid version of the trust.[1]  The court denied the petitions, finding among other things that the signatures on the trust were authentic.  It further found, however, that appellants had probable cause to bring the contest, precluding application of the trust's no contest clause under Probate Code section 21311.

---

[1]     The petition for damages also named Dourec, Lowell Wedemeyer, an attorney and another beneficiary under the trust, and Hoffman, Sabb and Watenmaker (Wolf's law firm).  Appellants do not seek to revive their claims against Wedemeyer or Hoffman, Sabb and Watenmaker.

Appellants appeal the order denying their contest petition and petition for damages. Their sole contention is that the court's finding that the signatures were authentic was not supported by substantial evidence. Dourec cross-appeals, contending the court's findings with respect to probable cause were erroneous, and that appellants should be disinherited. We conclude the court's findings with respect to the signatures were supported by substantial evidence, and that appellants had probable cause to bring the contest. Accordingly, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *Background Facts*

William L. Zeltonoga, an attorney, died December 4, 2011 at the age of 70. Zeltonoga suffered from terminal cancer and was hospitalized several times in his final days. During his final hospitalization, respondent Kenneth Wolf, a probate attorney, prepared a trust (the 2011 Trust) which left Zeltonoga's most valuable property -- a fourplex on Croft Avenue in Los Angeles -- to respondent Rachel Dourec, and appointed her trustee.[2] There were two signatures purporting to be Zeltonoga's on the document, both notarized by Wolf and dated November 20, 2011. The same date, Zeltonoga purportedly signed an amendment to his will. His

---

[2] The 2011 Trust also named appellants Ross, Gary Storer and the Harrisons, along with Lowell Wedemeyer and various charities as residual beneficiaries of the estate. Appellant Daniel Storer was left Zeltonoga's automobile. Zeltonoga's prior trust, executed May 11, 2008, left his estate to his brother Robert, but if Robert predeceased him, 70 percent was to be divided equally among appellants Ross, Gary Storer and the Harrisons, and three nonparties. The remaining 30 percent was to go to various charities. Robert Zeltonoga died in July 2008. There were no other siblings. Neither Robert nor William Zeltonoga ever married, and neither had children.

3

signature on the will amendment was witnessed by Wolf and George Baptist, Zeltonoga's caregiver.[3]

The 2011 Trust included a no-contest provision, stating: "If any devisee, legatee or beneficiary in this Trust Agreement, or any person who would be entitled to share in either Trustor's estate through intestate succession, shall in any manner whatsoever, either directly or indirectly, oppose, contest or attack this Trust Agreement or the distribution of Trustor's estate hereunder, or seek to impair, invalidate or set aside any of the provisions of this Trust Agreement, or shall aid in doing any of the above acts, then in that event Trustor hereby gives to any such person the sum of One Dollar ($1.00) only, in lieu of any other share or interest in Trustor's estate, either under this Trust Agreement or through intestate succession."

B. *Petition to Determine Trust's Validity and Petition for Damages*

On January 23, 2012, appellants filed a petition to determine the validity of the 2011 Trust. The petition raised five grounds for the contest. The first contended that the signatures on the 2011 Trust which purported to be Zeltonoga's were forgeries. The petition stated that the signatures on the 2011 Trust, and the durable power of attorney signed that same date, had been analyzed and compared with known signatures of Zeltonoga by handwriting experts who concluded the signatures were not his.

In the second ground for contest, the petition alleged that the 2011 Trust was the product of undue influence exercised by Dourec. It alleged that Dourec's

---

[3]     On the same date, Zeltonoga also purportedly signed a durable power of attorney. Except insofar as the signatures on the will and durable power of attorney support that Zeltonoga did or did not sign the 2011 Trust, those documents are not at issue in this appeal.

relationship with Zeltonoga had been as a clerical assistant in connection with the administration of an unrelated trust. In July 2011, when Zeltonoga suffered a brain hemorrhage, Dourec was present and drove him to UCLA Medical Center, "falsely represent[ing] to [Zeltonoga] she was on the Board . . . ." She was thereafter closely involved in his medical care. She allegedly represented herself as Zeltonoga's sister, and when he was hospitalized, "bedridden" and "helpless," Dourec purportedly "isolated [Zeltonoga] from his friends," "barred entry at the hospital," and "blocked multiple telephone calls," while she "creat[ed] an environment of unnatural flattery and ultimately dependence." Dourec purportedly assisted Zeltonoga with estate planning during this time, and "instructed and caused an attorney to prepare a document to be purportedly executed by [Zeltonoga] as an amended trust that would leave the majority of his assets to [Dourec]."

As a third ground for contest, the petition alleged that Zeltonoga had insufficient mental capacity to understand the nature of his actions at the time the 2011 Trust was executed. The fourth ground for contest was fraud, based on the allegation that Dourec "isolat[ed]" Zeltonoga and "convinc[ed] him that only she cared for him and that she should receive the greatest share of [his] assets." Finally, the petition alleged as a fifth ground for contest that Zeltonoga was a "dependent adult" and Dourec a "care custodian" within the meaning of Probate Code section 21380, subdivision (a), albeit one providing services "without remuneration," giving rise to a presumption under the statute that the donative transfer was "the product of fraud or undue influence."[4]

---

[4] On March 2, 2012, after receipt of a copy of the 2011 Trust, appellants filed a supplemental petition including the trust document as an exhibit. The factual allegations of the supplemental petition were not substantially different from the original petition. In the interim between the original petition and the supplemental petition, appellants also

*(Fn. continued on next page.)*

5

On September 4, 2012, appellants Ross, Gary Storer and the Harrisons filed a petition for damages, seeking remuneration from Wolf and others. The petition re-pled many of the factual allegations of the petition contesting the validity of the 2011 Trust.

B. *Evidence at Trial*

1. *Appellants' Case in Chief*

The matter was tried to the court. During appellants' case in chief, witnesses testified that Zeltonoga suffered a brain hemorrhage in July 2011. At the time, Dourec was his employee, assisting him with the tasks necessary to the administration of a friend's trust.[5] Dourec was present when Zeltonoga became ill. She drove him to the emergency room at the UCLA Medical Center, where she was on the board of the UCLA Health System Auxiliary, which raises funds for special programs at the hospital. Dourec told hospital personnel she was

received a one-page handwritten document dated October 31, 2011, which purported to be an amendment to the Zeltonoga trust and a codicil to his will. (Although it purported to amend both Zeltonoga's trust and his will, this document will be referred to herein as the "holographic will" to distinguish it from the 2011 Trust.) The holographic will added Dourec and Wedemeyer as 10 percent and 20 percent beneficiaries, respectively, and named them co-trustees along with appellants Ross and Gary Storer. The supplemental petition asked the court to declare the holographic will invalid on the same grounds raised to contest the 2011 Trust. Because we affirm the trial court's conclusion that the 2011 Trust was valid, we need not address the validity of the holographic will.

[5] Dourec testified that she met Zeltonoga in the late 1980's or early 1990's, and that they had a brief romantic relationship. Thereafter, they became good friends, going out regularly for lunch and dinner, and attending social functions together. In 2009, after Dourec's friend and former employee Marilyn Jensen died, Zeltonoga hired Dourec to help him with the administration of Jensen's trust.

6

Zeltonoga's sister.[6] Dourec told Zeltonoga's friends she was on "the . . . board" at the Medical Center. In August 2011, Dourec was appointed to be one of Zeltonoga's representatives in his healthcare directive.[7]

After recovering from the brain hemorrhage, Zeltonoga remained in poor health and lost considerable weight. He was hospitalized for a second time on October 20, 2011 and diagnosed with gastric cancer. Between November 6 and 17, he was out of the hospital, convalescing at home. On November 17, 2011, he was hospitalized for a third and final time. He was released November 26 and died at home. During this period, Dourec was his constant companion. She took him to medical appointments and interacted with doctors on his behalf.

Sebastian Harrison had known Zeltonoga more than 40 years and considered him a "father figure" and a close friend. Prior to his illness, they spent time together every week. Dourec called Harrison when Zeltonoga was hospitalized in July 2011. Harrison visited him multiple times, and drove him home after his discharge. Dourec did not inform Harrison of the October 20, 2011 hospitalization for some time, although Harrison was co-agent on Zeltonoga's healthcare directive and called and spoke with her several times inquiring about Zeltonoga after it occurred.[8] When Harrison met Dourec, Zeltonoga told him that she was his assistant, helping administer the unrelated trust. On one occasion when Harrison visited Zeltonoga near the end of November 2011, Zeltonoga was hallucinating.

---

[6]     Dourec said she did so in the hopes of obtaining better treatment for Zeltonoga or more expeditious access to specialists based on her connection to the Medical Center as a volunteer on the Auxiliary Board.

[7]     Sebastian Harrison was the other representative. In October 2011, Sebastian was replaced by Gary Storer.

[8]     Dourec testified she was following Zeltonoga's request that he be allowed to inform his friends of his diagnosis in his own time.

Gary Storer had known Zeltonoga 33 years. They vacationed together. Storer's son, Daniel, was Zeltonoga's godson. Storer visited Zeltonoga many times when he was ill, including November 18, 2011. On that day, Zeltonoga was unable to carry on a conversation and appeared to be hallucinating. Although Storer was co-agent on the healthcare directive after October 2011, Dourec consulted with him about Zeltonoga's care on only one occasion. When Storer met Dourec, Zeltonoga said she was helping him with administrative tasks related to a trust, and happened to be present when he suffered the hemorrhage.

Richard Ross, also an attorney, had known Zeltonoga 35 years. For a lengthy period, they shared office space, and sometimes worked together. On November 19, 2011, Ross saw Dourec going over papers with Zeltonoga in his hospital room. She said they were "'estate planning.'"

Multiple witnesses who had known Zeltonoga for a long time, including appellants, testified they had never heard Zeltonoga refer to Dourec as his friend, although he often talked about other friends. Appellants and other witnesses described seeing signs on Zeltonoga's hospital room door and the door of his residence discouraging visitors. Witnesses also said they were turned away by Dourec or staff when they attempted to visit Zeltonoga during his illness, at home and at the hospital. Witnesses observed Dourec or Wedemeyer or both of them in Zeltonoga's home office, going through his desk and papers. Dr. James Spar, appellants' medical expert, testified that although he believed Zeltonoga had testamentary capacity in the latter part of November 2011, Zeltonoga was cognitively impaired, rendering him susceptible to undue influence.

Wedemeyer testified that on November 19, 2011, Zeltonoga told him he wanted to leave the apartment building to Dourec. Zeltonoga gave Wedemeyer a file containing testamentary documents, including the holographic will, and asked Wedemeyer to take some notes. Wedemeyer soon realized Zeltonoga wanted him

8

to prepare an amended will and trust that named him a beneficiary. He informed Zeltonoga that would not be appropriate. He advised engaging Wolf.[9]

Wolf testified he received a call from Wedemeyer on November 19, 2011. He called Zeltonoga and was put through by Dourec, who answered Zeltonoga's phone.[10] When he arrived at the hospital, Dourec was in Zeltonoga's room, but left while Wolf talked to Zeltonoga. Zeltonoga described Dourec as a very dear friend, "like [a] sister" to him, and someone who had been invaluable to him in the previous months, assisting him with his medical needs. He said he wanted her to have the apartment building, and that "of all of the beneficiaries, she probably could use it the most." Wolf made notes on Zeltonoga's intended disposition of his assets. Before Wolf left, Dourec handed him a file containing Zeltonoga's preexisting will and trust and the holographic will.

Wolf prepared the amended will and trust and the durable power of attorney. He returned to the hospital November 20 in the evening and went over the documents with Zeltonoga. Discovering he had spelled Zeltonoga's name and the name of one of the residual beneficiaries incorrectly, Wolf returned to his office and made corrections. When he returned later that evening, Zeltonoga signed the documents in Wolf's presence. Wolf witnessed the signature on the will and asked George Baptist, Zeltonoga's aide, to be the second witness.[11] Wolf testified Baptist was present when Zeltonoga signed all the documents at issue: the 2011

---

[9]     Zeltonoga, Wedemeyer and Wolf had been classmates at Harvard Law School.

[10]     Dourec recalled that she placed the call to Wolf and then put Zeltonoga on the line.

[11]     Wolf was under the misapprehension that Baptist was a hospital employee and was surprised when he agreed to serve as a witness, as hospital employees are generally not allowed to witness wills.

Trust, the amended will, and the durable power of attorney.[12] Wolf forgot to obtain Zeltonoga's thumbprint in his notary journal. In the notary journal, Dourec's driver's license number was written in the space for Zeltonoga's driver's license number, then crossed out.

Baptist had been hired to stay with Zeltonoga and assist him. He worked 12-hour shifts, beginning November 11, 2011 and continuing until Zeltonoga's death. He testified that Zeltonoga referred to Dourec as his sister when he introduced her to Baptist. On the night of November 18, he was told by Dourec not to give Zeltonoga morphine because he had a very important decision to make. Baptist was asked to witness Zeltonoga's signature on a document, but was not told the nature of the document. He recalled Zeltonoga signing only one document in his presence. Zeltonoga was sitting up and wrote slowly at the time, but did not appear to be having difficulty signing the document.

Howard Rile, the appellants' handwriting expert, testified that he was "virtually certain" that the signatures on the documents at issue -- the 2011 Trust, the will amendment and the durable power of attorney -- were not Zeltonoga's.[13] The first portion -- the "Zelt" -- differed significantly from Zeltonoga's known signature on other documents, including a check he had signed November 20, 2011. In addition, the signatures were written slowly, which is an indication of forgery.[14] Rile knew generally that Zeltonoga was hospitalized on November 20 and in very poor health, but did not know the exact nature of his illness, that he had

---

[12] Wolf later testified that Zeltonoga signed each of the documents "slowly" and "deliberately" while lying in bed, stopping at times due to pain.

[13] Rile concluded, however, that the signature on the holographic will was Zeltonoga's.

[14] Rile found no evidence of tracing or copying. He saw evidence the signatures were all written by the same person.

lost a significant portion of his body weight, or that his morphine drip had been stopped prior to his signing the documents. Nor did Rile know how Zeltonoga was positioned in relation to the documents when he signed. Rile acknowledged that these factors could cause an authentic signature to look different. On cross-examination, Rile conceded that given his degree of certainty, which he described as an eight on a scale of nine, his opinion had "an element of doubt" and there was a "slight chance" the signatures could have been Zeltonoga's.

2. *Section 631.8 Motions*

After appellants rested, Dourec and the respondents to the petition for damages moved for judgment under Code of Civil Procedure section 631.8.[15] Dourec's counsel contended the record was devoid of evidence that Zeltonoga lacked capacity. Ross, acting as counsel for appellants, conceded the point. Ross also conceded that there had been no evidence introduced by appellants that Dourec was a paid care custodian. The trial court granted the motion with respect to the lack of capacity and care custodian grounds for the contest.[16]

The court examined fraud and undue influence together.[17] It concluded appellants had not succeeded in shifting the burden of proof to Dourec. It was

---

[15] Code of Civil Procedure section 631.8 provides: "After a party has completed his presentation of evidence in a trial by the court, the other party, without waiving his right to offer evidence in support of his defense or in rebuttal in the event the motion is not granted, may move for a judgment. The court as trier of the facts shall weigh the evidence and may render a judgment in favor of the moving party . . . ."

[16] The trial court also granted Wedemeyer's motion for judgment in his favor in its entirety.

[17] This was at the behest of Dourec's counsel, who asserted that undue influence and fraud were "predicated on the same allegations" -- that Dourec "forced or pressured . . . Zeltonoga to make . . . changes" and "overbore [his] free will" -- and should be

*(Fn. continued on next page.)*

11

clear Dourec had a confidential relationship with Zeltonoga.[18] In addition, evidence supported the conclusion that she "profited unduly" under the trust. However, the court found no evidence of active procurement by Dourec. Wedemeyer was active in arranging for Zeltonoga to see Wolf; Dourec's involvement was limited to either initiating the call with Wolf or picking up the cell phone when Wolf called. The court nonetheless denied the Code of Civil Procedure section 631.8 motion as it pertained to fraud/undue influence. Noting that evidence in support of such claims often was circumstantial, the court stated: "I've got an . . . ill man. He's terminal. He's dying of cancer. I have signs on hospital doors and on an apartment door that say, go away. [¶] I have . . . evidence that Rachel Dourec is controlling who has the ability to see [Zeltonoga] and who does not have the ability. I have Rachel Dourec who's interacting with doctors. I have Rachel Dourec who's interacting with caregivers at home. [¶] I think that the petitioner[s] ha[ve] made a circumstantial case of undue influence."

With respect to forgery, the court found Rile's testimony "quite compelling." The court was "really bothered by the signatures," having observed during the appellants' case that "the 'Z'" on the suspect documents was "completely different" from its appearance on confirmed documents, and that there were no exemplars indicating that Zeltonoga "ever signed his name like [the documents in issue] had been signed." The court was troubled that the page in Wolf's notary book authenticating Zeltonoga's signatures was not properly completed, that Dourec's driver's license number appeared in the space for

---

considered together. The court agreed that "fraud and undue influence [were] sort of a collapsed cause of action or claim."

[18] Specifically, the court found the evidence supported that "[s]he was helping him"; "[s]he was consistently there"; "[s]he was dealing with caregivers"; "[s]he was helping with medical issues"; and "[h]e relied on her."

12

Zeltonoga's driver's license number, and that Wolf had not been prepared with a witness when he arrived at the hospital, although he knew hospital personnel generally refuse to witness testamentary documents. The court concluded that before rendering judgment on whether the signatures on the 2011 Trust had been forged, it would need to hear from respondents and, in particular, their forensic document examiner.

### 3. *Defense Case*

Wesley Grose, respondents' forensic document examiner, had studied many more exemplars of Zeltonoga's confirmed signature than Rile -- approximately 70.[19] He observed similarities between the suspect signatures and some of the confirmed signatures. In particular, he found some exemplars with a similar "Zelt" combination. On the whole, he believed there was "more weight on the side" that the suspect signatures were Zeltonoga's due to the similarities he found and the other factors he considered, such as Zeltonoga's health and the position in which he was writing. Grose could not say, however, that there were "more similarities than variations" based solely on the writing styles. Grose agreed with Rile that the signatures had been written slowly, but explained that this could have been due to factors other than forgery, such as physical demands or disability. Grose concluded it was impossible to reach "a conclusion of authorship or non[-]authorship" based on the signatures. In Grose's view, the evidence simply did "not allow [one] to say whether or not it was written by a particular writer."

---

[19] Because appellants raise no contentions relating to the court's findings on issues other than forgery, we do not summarize the other evidence introduced by respondents. We note, however, that substantial evidence supported that Zeltonoga was of sound mind, that he and Dourec had had a personal and amicable relationship for many years, and that he was grateful to Dourec during his final illness for the care she provided and the efforts she made on his behalf.

Using the same nine-point scale as Rile, Grose placed the degree of certitude at five, meaning that the determination as to authenticity was necessarily inconclusive.

C. *Trial Court's Decision*

The court wrote a lengthy and detailed statement of decision, thoroughly reviewing all the issues and evidence. For purposes of the appeal, the most significant finding was that the signatures on the 2011 Trust were not forgeries. Concluding that Grose's opinion was "more credible and persuasive overall," the court based its finding on the evidence that Rile believed serious illness, medication, weakness, and the writer's physical position could affect his signature, that Grose found "more similarities than differences" between the questioned signatures and the exemplars, that Grose "appeared to take into account more detail concerning [Zeltonoga] and his physical condition," and that Rile admitted "there was a 'slight chance' [Zeltonoga] could have signed the documents in issue."

The court explained that in reaching its conclusion on forgery, it did not consider the experts' opinions in a vacuum, but considered them "along with all of the other evidence presented in the entire case on the issue . . . ." The court found the testimony of Wolf and Baptist credible. There was "nothing during their direct testimony or cross-examination that did not appear to ring true." "While the specific details in the narratives of the execution of the documents were not entirely consistent," such inconsistencies were "considered along with all of the other relevant evidence." The court found no evidence that Wolf had a motive to lie about preparing the estate planning documents and having Zeltonoga sign them. Nor had appellants identified any motive Baptist had to lie about witnessing Zeltonoga sign at least one document. In addition, the court found that Wolf had much to lose by forging documents and committing perjury, as he was a State Bar

14

certified specialist in estate planning, chair of the USC Gould School of Law Trust and Estate Conference, and a fellow of the American College of Trust and Estate Counsel.

With respect to undue influence, the court found evidence of a confidential relationship between Dourec and Zeltonoga: "She was assisting him with his personal needs during a time when he knew his illness was terminal" and he "placed great trust in . . . Dourec."[20] However, the evidence did not support that Dourec had actively procured the preparation or execution of the estate planning documents. She had no preexisting relationship with Wolf, and it was Wedemeyer who contacted Wolf to say that Zeltonoga wished to change his estate plan. The court was not persuaded otherwise by the "[t]he single call . . . which resulted in . . . Dourec passing the phone to [Zeltonoga]" or by "the brief encounters . . . Dourec had with . . . Wolf at the hospital." Although Dourec may have reviewed papers with Zeltonoga to help him "estate plan[]," the evidence that Wolf counseled him confidentially and that all of Wolf's information about Zeltonoga's testamentary desires came directly from Zeltonoga established to the court's satisfaction that the plan was his.

With respect to whether the gift to Dourec represented an unnatural disposition, the court pointed out that in November 2011, Zeltonoga had no surviving close relatives. His prior wills and trusts, prepared before his mother and brother died, left the apartment building to one of them. In other words, "[p]etitioners only received an interest in the apartment building [in prior wills and trusts] as an alternate disposition, a default. In each of [Zeltonoga's] prior estate

---

[20] Although appellants do not challenge the court's findings on undue influence or any of the grounds for the contest other than forgery, the court's discussion of the evidence relevant to the other areas of the contest has bearing on the cross-appeal, which contends appellants lacked probable cause to challenge the 2011 Trust on any ground.

15

plans, the apartment building was left for immediate family with a number of individuals to share in the disposition of the apartment building if immediate family predeceased the decedent." Thus, the estate planning documents prepared in 2011 represented "the first time [Zeltonoga] had to make a plan for his assets where he knew that family members would not be receiving his estate." Because Dourec provided substantial care for Zeltonoga in the last months of his life, he was grateful to her. Accordingly, the court found the gift was not unnatural and did not represent an undue benefit.

Because the court found insufficient evidence to support active procurement or unnatural disposition, the burden of proof was not shifted to Dourec to disprove undue influence. The court, therefore, considered whether a preponderance of the evidence as a whole supported an inference that the 2011 Trust was the product of undue influence. The court concluded it did not. The court found that Zeltonoga's mental functioning was intact during the relevant period, and that he could reason and understand consequences. The court further found that Zeltonoga was separately and confidentially counseled and reasonably believed that Dourec would benefit more from the gift than others in his acquaintance. In view of these findings, the preponderance of the evidence did not support that the 2011 Trust was the produce of undue influence.[21]

The court's final ruling addressed whether appellants had probable cause to bring the contest, which would determine whether they were disinherited under the 2011 Trust's no contest provision. Because the petition was filed January 23, 2012, the court concluded the key issue was what appellants knew at that time.

---

[21]    The court went on to find in favor of the remaining respondents (Wolf and his law firm) on the claims in the petition for damages. The only aspect of the ruling at issue in the appeal is the claim of forgery as it relates to Wolf.

With respect to the allegations that Zeltonoga's signatures had been forged, the court found a clear basis to support probable cause. The appellants had retained Rile, and he had opined that the signatures on the 2011 Trust were forged prior to the petition's filing date. The court found the same true with respect to undue influence. Among other things, the court found that it was reasonable for appellants to believe and assert that Dourec isolated Zeltonoga from his friends by controlling his visitation and contact, and that Zeltonoga's significant health issues rendered him vulnerable to undue influence. The court found the fraud ground for the contest supported in the same manner as the undue influence ground. The allegations of lack of testamentary capacity were reasonably based on appellants' knowledge that Zeltonoga had suffered multiple hospitalizations, experienced substantial weight loss, and signed the testamentary documents 14 days before he died.

In its original statement of decision, the court asked for further briefing on the allegation that Dourec was a "'care custodian'" within the meaning of Probate Code section 21380. After reviewing the briefing, the court concluded in a separate order that there was probable to cause assert that basis for the contest. The definition of care custodian, found in Probate Code section 21362, includes a person who provides "health or social services to a dependent adult." The court concluded that at the time they filed the contest, appellants knew Dourec was providing such social services to Zeltonoga, who fit the definition of dependent adult.[22] The definition of care custodian does not include a person who provides such services "'without remuneration'" where that person "'had a personal

---

[22] A dependent adult includes a person 65 years of age unable to provide properly for his or her personal needs for physical health, food, clothing, or shelter or having difficulty resisting fraud or undue influence due to deficits in mental function. (Prob. Code, § 21366.)

relationship with the dependent adult (1) at least 90 days before providing those services'" and "'(2) at least six months before the dependent adults' death.'" The court found that appellants had no reason to believe Dourec had a personal relationship with Zeltonoga prior to his illness, as they had been informed by Zeltonoga that she was an employee, and they had never heard him speak of Dourec other than in a business context. Based on these findings, the court ruled that appellants had probable cause to assert that Dourec was a care custodian. Appellants appealed the order denying the petitions; Dourec appealed the order finding probable cause for the contest.

## DISCUSSION

A. *Appeal*

Appellants contend the court erred in finding, contrary to Rile's expert opinion, that the two Zeltonoga signatures on the 2011 Trust were authentic. Appellants assert that Rile's testimony was uncontradicted, as Grose's "nonopinion" did not establish the validity of the signatures, and there was insufficient evidence to otherwise support the finding.

It is true that the trier of fact "is not entitled, arbitrarily or upon mere caprice, to disregard uncontradicted, entirely probable testimony of unimpeached witnesses." (*Mantonya v. Bratlie* (1948) 33 Cal.2d 120, 127.) However, expert testimony, like that of other witnesses, need not be credited unconditionally: "[E]xpert testimony, like any other, may be rejected by the trier of fact, so long as the rejection is not arbitrary." (*Conservatorship of McKeown* (1994) 25 Cal.App.4th 502, 509; accord, *Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d

875, 890; *Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 633.)[23]  Where uncontradicted testimony has been rejected by the trier of fact, "it 'cannot be credited on appeal unless, in view of the whole record, it is clear, positive, and of such a nature that it cannot rationally be disbelieved.' [Citation.]" (*Adoption of Arthur M.* (2007) 149 Cal.App.4th 704, 717.)

Here, there was nothing arbitrary about the trial court's determination of the forgery issue.  After examining a limited number of exemplars, Rile testified he was "virtually certain" the signature on the 2011 Trust was not Zeltonoga's.  His opinion was based in large part on the differences between the way Zeltonoga usually wrote the first syllable of his name and the way it appeared on the suspect documents.  Rile conceded his degree of certainty left some room for doubt.  He also conceded he had not been aware of all of the factors that could have affected Zeltonoga's writing ability, including the pain he may have been experiencing as a result of the cessation of the morphine drip and his physical position in relation to the documents he was signing.  Grose examined many more exemplars and found some authentic signatures in which the "Zelt" resembled the writing on the suspect documents.  He also found multiple other similarities between the authentic signatures and the suspect signatures.  When he rendered his opinion, Grose was more familiar with all the circumstances surrounding the signing of the November 20 documents.  He concluded that although there was "more weight" on the side of authenticity, there was insufficient evidence to support a definite opinion either way.  As the court found, this undermined Rile's opinion.

---

[23]     The exception to this rule is in malpractice cases, "where the standard of care, when testified to by experts who are uncontradicted, may be conclusively shown by such testimony." (*Conservatorship of McKeown*, *supra*, 25 Cal.App.4th at p. 509; *Howard v. Owens Corning*, *supra*, 72 Cal.App.4th at pp. 632-633.)

19

Having reasonably found the physical evidence and the testimony of the experts inconclusive, the court was free to rely on other evidence to determine whether the signature on the 2011 Trust was forged. Wolf and Baptist were witnesses to Zeltonoga's signature on the will. They both testified that he signed that document in their presence. This supported an inference that other documents signed at the same time were authentic. In addition, Wolf testified in detail concerning meeting with Zeltonoga, ascertaining his desires, putting the testamentary documents together, and obtaining Zeltonoga's signature on all of them. Appellants point out that there were inconsistencies between Wolf's and Baptist's testimony: Wolf said Zeltonoga was in pain and signed haltingly and that Baptist was present for the signing of all the documents, whereas Baptist recalled Zeltonoga signing slowly but without difficulty and observing him sign only one document. The court acknowledged these discrepancies but found them insufficient to warrant discrediting the witnesses' testimony. We are bound by the court's credibility findings.[24] (See *Lenk v. Total-Western, Inc*. (2001) 89 Cal.App.4th 959, 968 ["'" [I]t is the exclusive province of the [trier of fact] to determine the credibility of a witness . . . .'"'"]; *People v. Leigh* (1985) 168 Cal.App.3d 217, 221 ["[T]he testimony of a single witness is sufficient to uphold a judgment even if it is contradicted by other evidence, inconsistent or false as to other portions."].)

---

[24] Appellants contend Wolf was biased when he testified in support of authenticity, as he had been hired by Dourec to represent her in connection with administration of the 2011 Trust and was himself a party to the proceedings. Appellants' theory is reliant not only on Wolf's committing perjury at trial in 2013, but on his being complicit in forging testamentary documents or covering up a forgery in November 2011. As the court found, Wolf had nothing to gain and much to lose had he become involved in such a scheme. Moreover, as the court further observed, there was no basis to discount Baptist's credibility. He had no reason to lie about seeing Zeltonoga sign a document in the hospital in the presence of Wolf.

20

In an attempt to bolster their challenge to the court's findings, appellants mischaracterize Grose's testimony as suggesting that "70-plus documents was an insufficient number for anyone to determine authorship . . . ." (Italics added.) They cite cases in which a single exemplar supported a handwriting expert's opinion. (See, e.g., *People v. Young* (1941) 17 Cal.2d 451, 453.) Grose did not suggest that 70-plus documents was an insufficient number ever to support a conclusion; he testified that after reviewing 70-plus confirmed Zeltonoga signatures, he found sufficient similarities with the suspect signature to preclude him -- and by implication any other expert -- from saying with certainty that the suspect signatures were not Zeltonoga's.

Appellants quote statements the court made at the hearing on the Code of Civil Procedure section 631.8 motions, suggesting that the court itself observed sufficient differences to require a contrary finding. It is clear from the record that the court was troubled by Rile's testimony and the differences between the suspect signature and the exemplars Rile's examined. However, after hearing Grose's testimony and viewing the confirmed signatures Grose reviewed, the court reasonably found that Rile's testimony had been undermined. As for the other anomalies discussed by the court in denying the section 631.8 motions, such as the errors in the notary journal, none mandated a finding that the signatures were forgeries. In short, the trial court's rejection of Rile's expert testimony was not arbitrary or irrational, and we discern no basis to reverse its finding on forgery.[25]

---

[25] While we affirm the trial court's judgment in respondents' favor, we do not find appellants' appeal to have been frivolous. Accordingly, respondents' motion seeking sanctions for filing the appeal is denied.

21

B. *Cross-Appeal*

1. *Enforceability of No Contest Provision*

"An in terrorem or no contest clause in a trust instrument 'essentially acts as a disinheritance device, i.e., if a beneficiary contests or seeks to impair or invalidate the trust instrument or its provisions, the beneficiary will be disinherited and thus may not take the gift or devise provided under the instrument.'" (*Donkin v. Donkin* (2013) 58 Cal.4th 412, 422, quoting *Burch v. George* (1994) 7 Cal.4th 246, 265.) Such clauses "promote the public policies of honoring the intent of the donor and discouraging litigation by persons whose expectations are frustrated by the donative scheme of the instrument," but are in tension with "policy interests of avoiding forfeitures and promoting full access of the courts to all relevant information concerning the validity and effect of a will, trust, or other instrument." (*Donkin, supra,* 58 Cal.4th at p. 422.)

Whether to give effect to a no contest clause is governed by Probate Code section 21311, effective since 2010, which provides in pertinent part: "A no contest clause shall only be enforced against . . .[¶] (1) A direct contest that is brought without probable cause." (Prob. Code, § 21311, subd. (a).) Probate Code section 21310, added to the Code at the same time as section 21311, defines "'[c]ontest'" as "a pleading filed with the court by a beneficiary that would result in a penalty under a no contest clause, if the no contest clause is enforced" and a "'[d]irect contest'" as "a contest that alleges the invalidity of a protected instrument or one or more of its terms, based on one or more of the following grounds: [¶] (1) Forgery. [¶] (2) Lack of due execution. [¶] (3) Lack of capacity. [¶] (4) Menace, duress, fraud, or undue influence. [¶] (5) Revocation of a will pursuant to Section 6120, revocation of a trust pursuant to Section 15401, or revocation of an instrument other than a will or trust pursuant to the procedure for

22

revocation that is provide by statue or by the instrument. [¶] (6) Disqualification of a beneficiary under Sections 6112, 21350 or 21380."[26]

Preliminarily, the parties dispute the circumstances under which Probate Code section 21311 permits a no contest clause to be enforced. Appellants contend that the provision precludes enforcement of a no contest clause if any ground of the petition for contest is supported by probable cause; Dourec contends that a no contest clause is enforceable unless each ground for contest is supported by probable cause. The plain language of section 21311 leads us to conclude that appellants are correct.[27] As relevant here, section 21311, permits enforcement of a no contest clause only against "[a] direct contest brought without probable cause." (Prob. Code, § 21311, subd. (a)(1).) Section 21310 defines a direct contest as a contest that alleges the invalidity of a testamentary instrument on "one *or more* [of the listed] . . . grounds," including all of the grounds raised here -- forgery, lack of capacity, fraud, undue influence, and undue influence of a care custodian. (Italics added.) Under the plain meaning of the words of the statute, it is the "direct contest" -- which may include "one or more" grounds -- that must be supported by probable cause, not each and every ground of the contest. Had the Legislature intended otherwise, it could easily have defined each potential ground as a

---

[26] As previously mentioned, Probate Code section 21380, subdivision (a)(3) creates a presumption of undue influence for transfers made to a "care custodian of a transferor who is a dependent adult" under certain circumstances.

[27] The rules governing statutory construction are "well settled." (*Burden v. Snowden* (1992) 2 Cal.4th 556, 562.) Courts are to be guided by "the fundamental premise that the objective of statutory interpretation is to ascertain and effectuate legislative intent. [Citations.]" (*Ibid*.) The first step "is to scrutinize the actual words of the statute, giving them a plain and commonsense meaning." (*People v. Valladoli* (1996) 13 Cal.4th 590, 597.) "If the statutory language is clear and unambiguous, there is no need for construction." (*Viking Pools, Inc. v. Maloney* (1989) 48 Cal.3d 602, 606.) "[T]he Legislature is presumed to have meant what it said, and the plain meaning of the statute governs." (*People v. Johnson* (2002) 28 Cal.4th 240, 244.)

"contest" or stated that each "ground" of a contest must be supported by probable cause. As it did not do so, we conclude it did not intend to disinherit a petitioner if only one of multiple grounds alleged lack support.[28]

The words of a statute "may be disregarded to avoid absurd results" or "to give effect to manifest purposes that, in light of the statute's legislative history, appear from its provisions considered as a whole." (*East Peninsula Ed. Council, Inc. v. Palos Verdes Peninsula Unified School Dist*. (1989) 210 Cal.App.3d 155, 166.) Interpreting the provisions to require that the entire contest lack probable cause before the no contest clause can be given effect would not lead to absurd results. Many times, the grounds raised in a will or trust contest are interrelated. An elderly or seriously ill decedent is likely to have some level of diminished

---

[28] Dourec brings to our attention the recent decision of the Arizona Court of Appeals in *In re the Shaheen Trust* (2015) 236 Ariz. 498, which held "when a single petition alleges multiple challenges to a will or trust, and the challenges are brought in contravention of a no-contest provision, probable cause must exist as to each challenge." (*Id*. at p. 501.) The court relied primarily on the Restatement (Second) of Property: Donative Transfers, which states: "An otherwise effective provision in a will or other donative transfer, which is designed to prevent the acquisition or retention of an interest in property in the event there is a contest of the validity of the document transferring the interest or an attack on a particular provision of the document, is valid, unless there was probable cause for making the contest or attack." (Rest.2d of Property: Donative Transfers, § 9.1 (1983).) But as the Restatement does not define "contest or attack," the court used the definition in Black's Law Dictionary, defining "'contest'" as "'[t]o litigate or call into question; challenge'" (236 Ariz. at p. 501, quoting Black's Law Dictionary at p. 386 (10th ed. 2014)), and concluded: "When a party brings nine claims against a trustee . . . , that party litigates nine different challenges, and, accordingly, contests nine separate claims. If these nine claims had been presented in nine separate petitions, there would be no question that probable cause would have to support each claim to avoid forfeiture. We see no reason for a different result merely because the claims were asserted in a single petition." (236 Ariz. at p. 501.) Unlike the Arizona court, we are not free to use a dictionary definition of "contest." We are bound by the statute's definitions. The Legislature defined "contest" and "direct contest" to include "one or more" grounds; accordingly, if any ground in the petition is supported by probable cause, it cannot be said that the contest itself lacks probable cause.

24

capacity, rendering him or her especially vulnerable to undue influence or fraud by a care custodian or other person in a close relationship. Where at least one ground in a petition to determine the validity of a testamentary document is supported by probable cause, defending related grounds that are less well supported will not impose an undue burden on the proponent of the will or trust. Moreover, to the extent the proponent has been financially burdened by the challenger's assertion of less worthy grounds in an otherwise meritorious contest, an action for malicious prosecution provides a method of fair compensation. Enforcing a no contest clause, on the other hand, rewards the proponent of a will or trust with a lump sum that may have no bearing on the burden imposed by the contest and may unduly penalize a party who was simply attempting to ensure that a loved one's wishes were respected.

Nor would it violate the Legislature's intent which was both to simplify the law governing enforcement of no contest clauses, and to encourage those with substantial grounds to question a will or trust to feel free to mount a challenge. (See *Donkin v. Donkin*, *supra*, 58 Cal.4th at p. 425.) In recommending enactment of the provisions, the Law Review Commission stated: "An instrument should only be enforced if it expresses the free choice of a transferor who has the legally required mental capacity to understand the choice being made. An instrument that is the product of menace, duress, fraud, or undue influence is not an expression of the transferor's free will and should not be enforced.[] An instrument executed by a transferor who lacks the requisite mental capacity is also not a reliable expression of the transferor's wishes and is invalid.[] For obvious reasons, a forgery is not given effect. [¶] If a no contest clause deters a beneficiary from challenging an instrument on any of those grounds, it may work against the transferor's actual intentions, by protecting an instrument that should not be given effect."

(Recommendation: Revision of No Contest Clause Statute (Jan. 2008) 37 Cal. Law Revision Com. Rep. (2007) 359, 370-371, fns. omitted.) The Commission recognized that "[e]ven in a case where there is strong reason to suspect foul play, a beneficiary may still fall short of certainty that a contest would be successful." (*Id*. at p. 388.) In such a case, absent the enactment of sections 21310 and 21311, "the abuse may stand unchallenged." (37 Cal. Law Revision Com. Rep., *supra,* at p. 388.) Our interpretation of the statute supports the aim of encouraging well supported grounds for contest by freeing litigants from concern that a single allegation added imprudently or due to an attorney's misguided need for thoroughness does not lead to extreme consequences.

Dourec contends *Crowley v. Katleman* (1994) 8 Cal.4th 666 supports her interpretation of the statutes. (*Id*. at p. 671.) Our reading of the case convinces us otherwise. In *Crowley*, a will contest had been brought by a wife who was disinherited by her deceased husband in favor of the decedent's friend. The wife's contest alleged six separate grounds for invalidating the will: (1) undue influence; (2) revocation; (3) the existence of another will; (4) lack of testamentary capacity; (5) lack of due execution; and (6) fraud in the inducement. (*Id*. at p. 673.) After the probate court denied the contest and, the decedent's friend pursued a malicious prosecution action based on five of the six grounds asserted in the contest. (*Id*. at pp. 674-675.) The Supreme Court held that an action for malicious prosecution may be pursued against a party who brings a will contest asserting multiple grounds where some, but not all, of those grounds were asserted without probable cause. (*Id*. at pp. 671, 693-695.) At the same time, the court recognized that the probate court had rejected the proposition that the wife should be disinherited under the will's no contest provision, concluding that "'the enforcement of the no contest clause is not a proper substitute for a malicious prosecution action for whatever damages [the friend] can prove.'" (8 Cal.4th at p. 674.) Although the

26

Supreme Court did not have cause to address the merits of the probate court's decision, by including a discussion of it, the court implicitly recognized that the determination whether a malicious prosecution action is tenable is independent from a determination whether a no contest clause is enforceable. A petitioner who has asserted multiple grounds for contest, with malice and without probable cause, may be faced with a malicious prosecution action, without being disinherited. The holding in *Crowley* does not persuade us that the statutory provisions should be interpreted contrary to their plain language.

### 2. *Probable Cause*

Even were we to conclude that lack of probable cause to support a single ground permitted enforcement of a no contest clause, we would affirm the order at issue. The trial court's ruling that appellants had probable cause to assert all the grounds for contest in their petition is well supported by the evidence. Subdivision (b) of Probate Code section 21311 provides: "For the purposes of this section, probable cause exists if, at the time of filing a contest, the facts known to the contestant would cause a reasonable person to believe that there is a reasonable likelihood that the requested relief will be granted after an opportunity for further investigation or discovery." Discussing this provision, the Law Revision Commission explained: "Existing law requires only that it be 'likely' that the contestant will prevail. That degree of probability has been equated with the standard that governs malicious prosecution cases, requiring only that the contest be 'legally tenable.' [] The Commission believes that such a standard is too forgiving. A no contest clause should deter more than just a frivolous contest. General law already provides sanctions for frivolous actions.[] [¶] Instead, the proposed law would require a 'reasonable likelihood' of being granted relief.[]

27

That standard has been interpreted as requiring more than a mere possibility, but less than a likelihood that is 'more probable than not.'" (37 Cal. Law Revision Com. Rep.*, supra,* at p. 398, fns. omitted.) In the instant case, the trial court found that at the pertinent time -- when the petition was filed -- probable cause existed to assert all five grounds for the challenge. Reviewing the probable cause determination de novo based on the trial court's factual findings, we agree. (See *Franklin Mint. Co. v. Manatt, Phelps & Phillips, LLP* (2010) 184 Cal.App.4th 313, 361-364; *Arcaro v. Silva & Silva Enterprises Corp*. (1999) 77 Cal.App.4th 152, 156; *Puryear v. Golden Bear Ins. Co*. (1998) 66 Cal.App.4th 1188, 1195.)

### a. *Forgery*

Citing a criminal case (*People v Gaul-Alexander* (1995) 32 Cal.App.4th 735, 741), Dourec contends that in order to sustain a charge of forgery, there must be evidence of intent to defraud, and although appellants had Rile's opinion establishing a concrete basis for believing Zeltonoga had not signed the documents, they lacked any basis to believe the forger had the appropriate intent. Assuming another party had signed the 2011 Trust in Zeltonoga's name, as appellants could reasonably have believed based on Rile's opinion, the intent to defraud was obvious. The evidence indicating the signatures had been written by someone other than Zeltonoga supported all of the elements of the forgery ground for contest and provided probable cause for making the assertion.

### b. *Undue Influence*

Dourec contends the undue influence ground for contest lacked probable cause. She acknowledges there was sufficient evidence of a confidential relationship and undue benefit, but contends there was no evidence of active procurement or participation in obtaining the 2011 Trust on her part. Appellants

28

presented evidence that Dourec was seen gathering papers from Zeltonoga's office, and going over documents with Zeltonoga in his hospital room to help him "estate plan" one day before Zeltonoga consulted with Wolf to change the terms of his existing trust. Although the court ultimately concluded this was insufficient to shift the burden of proof to Dourec, it provided appellants with probable cause of the active procurement element at the time of filing the petition. Moreover, active procurement "may be established by inference . . . ." (*Estate of Baker* (1982) 131 Cal.App.3d 471, 481.) "[T]he one using the undue influence [need not] be present in person at the time of the execution of the document if the influence is present to constrain the party from exercising his free will." (*Ibid*.) "'"That the alleged wrongdoer had power or ability to control the testamentary act may be established by a variety of circumstances, -- such as control over the decedent's business affairs, dependency of the decedent upon the beneficiary for care and attention, or domination on the part of the beneficiary and subserviency on the part of the deceased."'" (*Ibid*., quoting *Estate of Washington* (1953) 116 Cal.App.2d 139, 145-146.) Given that Dourec was constantly at Zeltonoga's side in his final months of life, including the days he revised his will and trust, appellants had grounds to believe she caused him to engage an attorney to change the disposition of his assets, regardless of any specific evidence that she engaged Wolf or was present when Zeltonoga consulted with Wolf and signed the testamentary documents.

c. *Fraud*

Ignoring the position she took at trial, Dourec contends fraud should be considered separately from undue influence, and that there was no probable cause for alleging fraud. As courts have recognized, "'Oftentimes the terms "undue influence" and "fraud" are used interchangeably. Thus it has been held that undue

29

influence, even though exercised without the aid of actual fraud, or fraudulent representations, is a form of fraud.'" (*Wells Fargo Bank & Union Trust Co. v. Brady* (1953) 116 Cal.App.2d 381, 400, quoting *Estate of Newhall* (1923) 190 Cal. 709, 718.) The finding that probable cause existed for alleging fraud was properly based on the determination that probable cause supported the undue influence allegations.

### d. *Lack of Capacity*

Contending appellants lacked probable cause to assert that Zeltonoga lacked capacity, Dourec asserts: "During the course of discovery, [appellants] were informed that Mr. Zeltonoga most likely had testamentary capacity," gaining this knowledge on August 30, 2012, when appellants' medical expert, Dr. Spar, "told Mr. Ross that it was extremely likely that Mr. Zeltonoga had testamentary capacity on November 20, 2011." She contends "[a]t the end of August 2012, [a]ppellants should have dismissed the lack of capacity claim." The statute specifically provides that the existence of probable cause is to be determined at the time of filing a contest. It nowhere suggests that the petitioner must update the petition whenever new facts are uncovered. At the time they filed the petition challenging the validity of the 2011 Trust, appellants were aware that on or around November 20, 2011, Zeltonoga was gravely ill, weakened by loss of weight, hospitalized, and ingesting multiple drugs. Sebastian Harrison and Gary Storer testified that in the latter part of November 2011, Zeltonoga was unable to carry on a conversation and appeared to be hallucinating. He died two weeks after signing the new testamentary documents. These facts were sufficient to warrant including lack of capacity as a ground for the contest. Moreover, assuming a duty to reassess the petition's allegations as new evidence was uncovered, the record is clear that appellants did not litigate lack of capacity in their case in chief and conceded the

30

lack of viability of this ground for contest when Dourec and the respondents to the damage petition sought judgment under Code of Civil Procedure section 631.8.

### e. *Care Custodian*

Probate Code section 21380, effective January 1, 2011, provides that "[a] provision of an instrument making a donative transfer to any of the following persons is presumed to be the product of fraud or undue influence . . . A care custodian of a transferor who is a dependent adult, but only if the instrument was executed during the period in which the care custodian provided services to the transferor, or within 90 days before or after that period." Section 21362 defines "'[c]are custodian'" as "a person who provides health or social services to a dependent adult, except that 'care custodian' does not include a person who provided services without remuneration if the person had a personal relationship with the dependent adult (1) at least 90 days before providing those services, (2) at least six months before the dependent adult's death, and (3) before the dependent adult was admitted to hospice care, if the dependent adult was admitted to hospice care."

As the trial court found, appellants had no reason to believe that Dourec, who was clearly providing services to Zeltonoga, had a personal relationship with him that preceded provision of those services or that began six months before Zeltonoga's death as he had introduced her as an employee and had never discussed his relationship with her with any of the appellants. Dourec provides no basis to question these findings.

## DISPOSITION

The trial court's order denying the petition for contest, denying the petition for damages, and finding probable cause to bring the petition for contest is affirmed. The motion for sanctions is denied. Each party is to bear his or her own costs.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

MANELLA, J.

We concur:

EPSTEIN, P. J.

COLLINS, J.